**PLAYBOY ENTERPRISES, INC., Appellant,**

v.

**EDITORIAL CABALLERO, S.A. DE C.V., et al., Appellees.**

No. 13–03–048–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

May 25, 2006.

Motion for En Banc Reconsideration and Motion for Rehearing Overruled Oct. 12, 2006.

Harry M. Reasoner, Spikes Kangerga, Vinson & Elkins, Houston, for appellant.

Donald B. Edwards Craig S. Smith, Corpus Christi, for appellees.

Before Chief Justice VALDEZ and Justices HINOJOSA and RODRIGUEZ.

## OPINION

Opinion by Justice RODRIGUEZ.

This commercial dispute arose between plaintiff Eduardo Gongora,[1] appellant Playboy Enterprises, Inc. (PEI), and appellees Editorial Caballero, S.A. de C.V. (EC) and Grupo Siete International, Inc. (GSI). EC and GSI cross-claimed against PEI for fraud, breach of contract, breach of fiduciary duty, business disparagement, tortious interference, and interference with prospective business relations. PEI cross-claimed against EC and GSI alleging, among other things, breach of contract and fraud. Immediately before closing arguments and over PEI's objection, the trial court realigned EC and GSI as plaintiffs. The jury found for EC and GSI and against PEI on all claims, except interference with prospective business relations, and awarded $3,600,000 for out-of-pocket expenses, $500,000 for liabilities incurred, and $260,000 for lost profits. The jury declined to award punitive damages. With respect to PEI's claims, the jury found that both EC and GSI had committed fraud and various contractual breaches, but that their actions were excused.[2] The trial court rendered a final judgment for damages awarded by the jury in the amount of $4,360,000, plus the maximum allowable pre-judgment interest calculated from the date suit was filed and post-judgment interest at the maximum rate allowed by law.

PEI appeals from the judgment entered in favor of EC and GSI on their claims against PEI. By ten issues and sub-issues, PEI brings legal and factual sufficiency challenges related to the jury's liability and damage findings, and contends that the trial court erred in (1) realigning EC and GSI as plaintiffs, (2) failing to properly charge the jury on wrongful disparagement, and (3) refusing to send a requested exhibit to the jury room during deliberations. PEI asks this Court to reform the judgment, if affirmed, with respect to pre-judgment and post-judgment interest rates. By a single issue with sub-issues, PEI also appeals from the judgment entered against PEI on its breach of contract cross-claim because EC and GSI failed to make payments owed under the International Publishing License Agreement (the License Agreement) and under the Renegotiated Payment Plan. We reverse and render, in part, and remand, in part.

## I. BACKGROUND

For many years, pursuant to predecessor agreements between EC and PEI, EC published and distributed a Spanish language version of *Playboy* magazine in

1. Eduardo Gongora, who is in the business of selling and soliciting advertisements for products in different forms of media, sued PEI, EC, and GSI for failing to publish a Spanish language edition of *Playboy* in Mexico and to distribute it in the United States. Gongora lost on all of his claims in the trial court and is not a party to this appeal.

2. The trial court set out in its judgment that the following jury findings should be disregarded as immaterial findings or incomplete submissions: (1) EC failed to comply with the License Agreement; (2) EC and/or GSI failed to comply with the Renegotiated Payment Plan; (3) EC committed fraud against PEI; (4) GSI committed fraud against PEI; and (5) EC and/or GSI failed to comply with the terms of the asset purchase agreement and other contracts executed between them.

Mexico.[3] In October 1996, PEI and EC entered into the License Agreement at issue in this case. It provided that EC would continue to publish and distribute the magazine in Mexico. It also provided that EC, with PEI's prior written approval, could publish a Spanish language version of *Playboy* for distribution in the United States and could assign the United States distribution rights to, and only to, GSI.[4] The License Agreement was for a three-year term beginning January 1, 1997. The October 1997 issue was the first issue of the Spanish language edition of *Playboy* distributed in the United States pursuant to the License Agreement. PEI terminated the License Agreement in January 1998 for EC's non-payment of royalties and other payments owed. Before termination of the License Agreement, the parties had renegotiated payments and entered into a written Renegotiated Payment Plan.

## II. Fraud

By its second issue, PEI contends that EC and GSI cannot recover for fraud as a matter of law. Alternatively, it complains that the evidence is insufficient to support the finding.

The jury answered, "Yes," when asked, "Did [PEI] commit fraud against [EC] or [GSI], or both, proximately causing damages?" The jury was instructed, in part, as follows:

Fraud occurs when—

a. a party makes a material misrepresentation,

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party acted in reliance on the misrepresentation and thereby suffers injury.

### A. Oral Representations

PEI contends that EC and GSI cannot, as a matter of law, recover for fraud based on PEI's alleged oral representations because the License Agreement specifically bars EC and GSI from relying on oral representations. The alleged oral representations at issue in this case include the following: (1) PEI would not enforce or terminate the License Agreement; (2) renewal was automatic; (3) EC and GSI could import the Spanish language edition into the United States; (4) PEI intended to ramp up circulation after the initial three-year term of the License Agreement and was not concerned with "cannibalization;"[5] (5) it was not going to be a problem to distribute or sell 150,000 copies per month; and (6) the parties would be partners.

In this regard, [however,] a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests,

---

3. The Spanish language version of the magazine is titled *Playboy Un Estilo De Vida.*

4. Javier Sanchez Campuzano (Sanchez), EC's president and principal, signed the License Agreement on behalf of EC. GSI was EC's assignee of the U.S. distribution rights to the Spanish language version of *Playboy.* Paul Siegel was GSI's principal. It is undisputed that GSI assumed EC's obligations under the

License Agreement and expressly agreed to be bound by the License Agreement's terms and conditions.

5. "Cannibalization" is described, in this case, as hurting the U.S. sales of PEI's English-language version by distributing a Spanish language edition in the United States and as head to head competition with the U.S. *Playboy.*

and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.

*DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (en banc) (op. on reh'g).

■ The License Agreement, in this case, specifically provided for the following:

1. Upon the occurrence of an event of default, the non-defaulting party may terminate the License by written notice to the party in default;

2. On the condition that Licensee shall be in full compliance with the material terms of this Agreement, including the timely payment of all amounts required under this Agreement, then Licensee shall have the option ... to request negotiations concerning an extension of the license;

3. Distribution and sale of the Foreign Edition in any country other than Mexico will be subject to Licensor's prior written approval, which may be withdrawn once given, on notice from Licensor;

4. If Licensor fails or declines to grant such consent or approval to Licensee, Licensor shall not be liable to give any reason therefor;

5. Licensor's approval of such distribution and sale in the United States, if at all, will not occur until at least six (6) months following the legal formation of the joint venture Grupo Siete International, Inc., and if such approval is granted, will not exceed one-hundred-fifty thousand (150,000) copies per issue; and

6. The rights and powers herein granted to Licensee are those of a licensee only and this Agreement shall not, and is not intended to, create any other relationship nor make, constitute or appoint Licensee an agent or employee of Licensor.

The alleged oral representations about which EC and GSI complain are directly contradicted by the express, unambiguous terms of the License Agreement, and EC and GSI are not justified in relying upon them as a matter of law. *See id.* Thus, the fraud claim based on these oral representations is barred on this basis.

■ The License Agreement also contains a merger clause that specifically sets out that "this Agreement represents the entire understanding of the parties. None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by the parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement." Where a contract is negotiated at arms-length by sophisticated businessmen represented by counsel, this type of "merger" clause, like the clause in *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180–81 (Tex.1997), is enforceable and negates reliance on any alleged oral representations, an essential element of fraud as set out in the charge above. *See id.* (providing that merger clauses could, in some cases, operate to negate the reliance element of fraudulent-inducement claims arising from the same contract containing the merger clause); *see also IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 126–28 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (providing that provisions that contract was "entire agreement" and requiring any modifications to be in writing barred fraudulent-inducement claim under *Schlumberger*). Here, as in

*Schlumberger,* the alleged oral representations dealt with matters specific to PEI's rights under the License Agreement. Therefore, reliance by EC and GSI on the purported oral representations is negated as a matter of law on this basis.

### B. Media Kit

■ PEI also asserts that EC and GSI cannot rely on the asserted approval of the "media kit" as a representation that EC and GSI could distribute 225,000 copies monthly in the United States. GSI prepared the media kit to promote the planned U.S. launch of the magazine. The kit set out expected monthly U.S. distribution at 225,000 copies, with expected sales of 125,000 copies. However, the License Agreement, which required formal, written approval for any U.S. distribution, provided that, if approval was granted, such distribution and sale in the United States would not exceed 150,000 copies per issue. The number set out in the media kit exceeded 150,000, and PEI approval, if any, of a media kit was not the formal written approval for U.S. distribution required by the License Agreement. Therefore, because the alleged approval of the media kit and representations set out in the media kit dealt with matters specific to PEI's rights under the License Agreement, reliance by EC and GSI on these representations was also negated as a matter of law. *See Schlumberger,* 959 S.W.2d at 180–81; *DRC,* 112 S.W.3d at 858; *see also Airborne Freight Corp. v. C.R. Lee Enter.,* 847 S.W.2d 289, 297–98 (Tex.App.-El Paso 1992, writ denied).

### C. Fraudulent Concealment

The jury was also instructed, in part, as follows:

Fraud may also occur when—

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. a party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. a party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

### 1. Duty

PEI contends that fraudulent concealment cannot be based on PEI's alleged failure to disclose the concerns of Hugh Hefner, founder of *Playboy,* chairman emeritus, editor-in-chief, and owner of approximately seventy percent of the stock, about distributing a second-language version of *Playboy* in the United States, because it owed no such duty. PEI asserts it had no duty to disclose these concerns because it had no special relationship of trust and confidence with EC and GSI in this arms-length commercial transaction.

■ "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford v. Vento,* 48 S.W.3d 749, 756 (Tex.2001) (quoting *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998)); *see Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633–36 (Tex. App.-San Antonio 1993, writ denied). Such a duty can arise where there is a formal fiduciary relationship. *See Morris,* 981 S.W.2d at 674 (providing that "[f]iduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships"). Such a duty can also arise where there is a confidential relationship

between the parties. *Id.* (providing that "confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"). However, the existence of a fiduciary or confidential relationship is but one of the bases for imposing a duty to disclose information. *See Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.*, 941 S.W.2d 138, 146–47 (Tex.App.-Corpus Christi, 1995) (per curiam), *rev'd on other grounds*, 960 S.W.2d 41, 44 (Tex.1998). In addition to situations where there is a fiduciary or confidential relationship, as this Court set out in *Formosa Plastics,* a duty to speak may arise in an arms-length transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak. *Id.; Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Ralston Purina,* 850 S.W.2d at 635–36.[6] "Whether such a duty exists is a question of law." *Bradford,* 48 S.W.3d at 755; *see Hoggett,* 971 S.W.2d at 487.

The evidence in this case establishes that as early as the fall of 1996, PEI, EC,

and GSI knew of Hefner's concerns regarding the distribution of a Spanish language edition of *Playboy.* It is undisputed that before the License Agreement was signed in November 1996 and became effective in January 1997, PEI disclosed general information to EC and GSI regarding concerns it had about cannibalism and the publication of the Spanish language edition for distribution in the United States. For example, on October 17, 1996, Robert O'Donnell, a member of the board of directors, vice-president of the international publishing group, and business manager for PEI, wrote a memo to Henry Marks, a senior vice-president of the international publishing group and a member of the board of directors at PEI, which reads, in part, as follows:

> I just finished a coffee with [EC and GSI principals,] Javier [Sanchez Campuzano (Sanchez) ] and Paul [Siegel], and while feathers are still a bit ruffled, especially Javier's, they're going to sign the deal as written. . . .

> I was very clear to both of them that while I anticipated few problems or issues re: the other Spanish markets, that we should all prepare ourselves for the microscope, including, perhaps even "inputs" from Hef, for entering the USA.

Additionally, O'Donnell testified that PEI disclosed to EC and GSI that Hefner was upset and that cannibalization needed to be disproved.[7] Fernando Becerra Paramo,

---

**6.** While the Texas Supreme Court has not yet adopted section 551 of the second restatement of torts that is the basis for a general duty to disclose facts in a commercial setting, it has acknowledged that several courts of appeals have held a general duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See Bradford v. Vento,* 48 S.W.3d 749, 755–56 (Tex.2001) (citing RESTATEMENT (SECOND) OF TORTS § 551 (1977); *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Hous-

ton [14th Dist.] 1997, pet. denied); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633–36 (Tex.App.-San Antonio 1993, writ denied)); *see also SmithKline Beecham v. Jane Doe,* 903 S.W.2d 347, 352 (Tex.1995).

**7.** During October 1996, O'Donnell faxed the following internal memo to Siegel and Sanchez. Among other things, O'Donnell wrote,

> Hef's direction was that while Spanish language might be an OK idea, there can be only one U.S. Playboy. All we could do

GSI's editor-in-chief, also testified that he was aware of PEI's cannibalization concerns.

While there is evidence that PEI disclosed general concerns, the evidence also establishes that material facts regarding Hefner's position on cannibalization and his instructions regarding the publication of the Spanish language edition for distribution in the United States were not disclosed to EC and GSI. Early internal memos at PEI set out that what was being done was "quite contrary to how Hef envisioned this publication." In November 1996, after the License Agreement was signed, Christie Hefner, chairman of the board of directors, chief executive officer, and Hefner's daughter, wrote a memo to Marks and Bob Perkins setting out, in part, the following:

> My agreement to allow the export of the Mexican edition subject to creative and business parameters was not an agreement to allow quasi American and Mexican Spanish language editions. When Bob starts talking about U.S. drawings in the book, U.S. pictorials, U.S. interview subjects, we are now clearly crossing the line into a Spanish language edition of Playboy for the U.S. market competing with U.S. Playboy, which is not something that I approved and I think is directly contrary to concerns

that Hef expressed when we were looking at this as a stand-alone deal.

In December 1996, Hefner wrote the following internal memo:

> With the acquisition of the Mexican Playboy by a U.S. firm, it is important to make clear that the editorial focus and distribution of this Spanish language version of the magazine remain essentially Mexican.
>
> As previously expressed, I don't want a second language version of Playboy competing with us here in the U.S.

Again, in February 1997, after the License Agreement became effective, Hefner wrote internal memos expressing his position and dissatisfaction with the project. On February 4, 1997, he sent the following Playboy interoffice memo to Marks:

> There still seems to be real confusion on what is acceptable and not acceptable related to the distribution of a Spanish language edition (Mexican or other) in the United States.
>
> I have no problem with a direct Spanish translation of the U.S. magazine if we own it and can count the circulation toward our own rate base. But I have already rejected the idea of a separate Spanish language edition of PLAYBOY in the U.S. as being too confusing. And I am even more opposed to allowing some outside company [to] own and dis-

---

was to create an exact high quality translation of USPB. As this would have been in our minds the absolute worst approach to take, (image, cannibalization and relevance), I decided to look at the side door with the front door now barred.

I set up a meeting between the President of Sports Time, Paul Siegel, and our Mexican Publisher, Javier Campuzano, whose license was up for renewal at the end of this year, and who, with the economic crisis in Mexico, was having cash flow and payment problems and was trying to sell assets to raise money.

The basic purpose was to explore the concept of using cash that Sports Time could raise to invest in (1) upgrading the quality of the core Mexican Edition and support its recovery parallel with economic stabilization (2) creation of local market tailored versions of the edition for export to other Spanish speaking markets of South/Central America, (not large or yet strong enough for their own editions), and (3) do a U.S. Hispanic targeted version as soon as we could develop an acceptable positioning and pass the quality test.

tribute a Spanish edition (Mexican or not) here in the U.S.

The direct competition of a Spanish edition in the U.S. with a circulation of 130,000 to 150,000, as suggested in your memo, would clearly hurt the newsstand circulation and advertising rate base of the U.S. magazine and that impact—whether it costs us 5,000 copies or 50,000—makes no sense at a time when we are fighting a reduction in newsstand outlets and sales.

On February 7, 1997, Hefner sent the following memo to Christie:

I think it is naive to assume that distributing 100,000 copies of a Mexican edition in the United States won't have some impact on the newsstand sales of the U.S. edition when our own single copy sales are often no more than 500,000. With much of the celebrity pictorial and centerfold content the same in each issue, I'm concerned about the impact this will have on our rate base.

Even the loss of 5,000 or 10,000 copies a month will hurt us, but we'll never know, because there is really no way of monitoring the impact of this inappropriate competition.

I think this is a dumb decision done by people who do not understand the fuller implications of what they are doing.

This is being done despite my specific instructions to the contrary.

Throughout the year, memos continued to express the fact that "Hef is very concerned about the issue of cannibalization." For example, by internal memo in July 1997, Dick Rosenzweig, chief financial officer and Hefner's right-hand man and contact with the operations of the company, wrote the following memo to Christie, which reads in part:

Hef had and continues to have major reservations about how this project will negatively impact the circulation and advertising of [PEI's] domestic edition with very little additional revenue from the importation of this edition to us. Others and I have had many conversations with Henry Marks and Bob O'Donnell about this move and have asked for a definitive memo for Hef to review prior to moving ahead. I never received this memo.

When distribution numbers of 50,000 to 100,000 copies were originally mentioned Hef was enraged. He has no problem with a few thousand of these copies brought into the country just as we do with other foreign editions on foreign newsstands....

I notice on our current Calendar of Events we have three launch parties slated beginning in late August in Miami, New York and Los Angeles. I find it difficult to believe we're going to this trouble to launch a few thousand magazines. Hef continues to be adamant on this point and has dropped it back squarely in our laps.

He indicated he does not have a problem with our doing a direct Spanish translation of the domestic edition (which I understand has no appeal to the Hispanic market in this country) or he would consider a custom Spanish language edition if it were our project.

On August 21, 1997, Christie wrote to Rosenzweig regarding the test entry of the Spanish language version of *Playboy* into the United States. In her memo, she stated the following, in part:

Hef is still having great difficulty on making the decision to move ahead with the Mexican edition distribution in the U.S. He is concerned that the domestic circulation base continues to decline, we continue to lose outlets and despite Larry's memo of August 20th he worries about the domestic circulation.

He also worries about the quality of this magazine distributed in the U.S. and the amount of time it will take away from more important projects for some of our key people. Indeed, what it really gets down to for him are the economics—is it really worth doing? As he said, if this meant another two million dollars added to our bottom line it's one thing, but to do this with all of his concerns for little profit is not worth the experiment.

Finally, at trial, John McDonald, PEI's corporate representative, testified that while there was no confusion about Hefner not wanting a second-language version of Playboy competing with Playboy in the United States, because Hefner was not involved in the day-to-day operations of the company, it was a matter of Christie getting him to listen to reason and of PEI to prove that he was wrong. Additionally, at trial, O'Donnell testified that early in the project when the major strategy change from a "front door" to a "side door" approach was first presented to Christie she said okay, but she had to check with Hefner because that was his backyard.

■ Based on these facts, we conclude this evidence supports the imposition of a duty on PEI to disclose to EC and GSI material facts regarding Hefner's specific concerns about cannibalization and his instructions regarding the publication of the Spanish language edition for U.S. distribution. Without disclosing Hefner's position on these matters, the information relayed to EC and GSI regarding general concerns PEI had about cannibalism and the publication of the Spanish language edition for distribution in the United States was not the whole truth, was misleading, or conveyed a false impression. Thus, PEI's duty to disclose the material facts arose in at least one, if not all, of the following situations: when one voluntarily discloses information, he has a duty to disclose the whole truth; when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and when one makes a partial disclosure and conveys a false impression, he has the duty to speak. *See Hoggett,* 971 S.W.2d at 487 (citing *Formosa Plastics,* 941 S.W.2d at 146–47).

## 2. Sufficiency of the Evidence

Having determined that PEI owed EC and GSI the asserted duty to disclose information, we look next at PEI's contention that the evidence is legally and factually insufficient to establish that EC and GSI were ignorant of the undisclosed facts, an element of fraudulent concealment set out in the jury charge. *See Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 221 (Tex.2005); *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001) (providing that an assessment of the evidence "must be made in light of the jury charge that the district court gave without objection").

In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). In conducting a legal sufficiency review, we will sustain a legal sufficiency point if the record reveals the following: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citing Robert W. Calvert, "No Evidence" & "In-

sufficient Evidence" Points of Error, 38 Tex. L.Rev. 361, 362–63 (1960)). The fact finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.* at 819.

When reviewing factual insufficiency complaints, this Court considers, weighs, and examines all evidence which supports or undermines the finding. *Golden Eagle Archery v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). The finding is set aside only if the evidence standing alone is too weak to support the finding or the finding is so against the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *Id.*

 Jonathan Fink, GSI's corporate representative, testified that EC and GSI knew cannibalization was a concern to PEI, but only to the extent EC and GSI were "limited to selling 150,000 copies." He did not know there were concerns in December 1996 or that in 1997 Hefner was adamantly opposed to the activity in which PEI, EC, and GSI were involved. Fink testified that they were not told that Hefner did not want a second-language edition for fear it would cannibalize the U.S. *Playboy.* O'Donnell did not tell Fink of the substance of Hefner's February memos; he did not tell him that if there was any cannibalization it would kill the deal. Fink testified that before the expected Cinco de Mayo launch, Playboy's representatives were very upbeat and excited about the launch and were helpful in every way. Fink testified that, even with limited distribution in September, October, and November 1997, they were still being told "everyone, be calm, let's work together, we'll work this out, it's not a problem, we'll go forward, we'll do more in the future."

As set out above, the evidence, including the evidence supporting a conclusion of duty to disclose, reveals that PEI only generally informed EC and GSI of Hef-

ner's concerns. While representing that cannibalism was an issue, the evidence establishes that PEI did not disclose to EC and GSI that Hefner was adamant about not allowing cannibalization of the U.S. edition and that he had instructed PEI executives not to publish the Spanish language edition of *Playboy* (Mexican or other) unless the Spanish language edition was owned one hundred percent by PEI and the Spanish language edition was an exact translation of the U.S. *Playboy.* The evidence provides more than a scintilla of evidence to establish that EC and GSI were ignorant of the undisclosed facts. *See City of Keller,* 168 S.W.3d at 810. Thus, reviewing the evidence in the light most favorable to the verdict and disregarding all contrary evidence that a reasonable jury could have disbelieved, we conclude the evidence is legally sufficient to support the jury's fraud finding. *See id.* at 807.

Moreover, considering, weighing, and examining all evidence which supports or undermines the finding, we conclude the evidence standing alone is not too weak to support the finding or the finding is not so against the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *See Golden Eagle Archery,* 116 S.W.3d at 761. Thus, we conclude that there is factually sufficient evidence to support this element of fraudulent concealment.

Having concluded that PEI had a duty to disclose and that the evidence supports the jury's finding, EC and GSI can recover for fraud on this basis. PEI's second issue is overruled.

### III. Tortious Interference with Existing Contractual Relationships

 In issue three, PEI argues that there is no evidence that it interfered

with any contracts between EC and GSI and third parties. We agree. "A tortious interference cause of action is established if the plaintiff proves: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss resulted." *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996). In this case, we find no evidence, and EC and GSI refer us to none, that supports a finding that PEI interfered with contracts between EC and GSI and third parties. Although EC and GSI assert that PEI's alleged approval of the distribution numbers in the media kit "interfered with [their] business relations with investors, advertiser, and others," they do not identify any such contracts, and we find no record of such contracts being presented at trial.

EC and GSI also assert that there is evidence to support this finding because PEI allegedly interfered with the contracts between EC and GSI. They rely on Sanchez's testimony that PEI's Henry Marks encouraged Sanchez and EC to end the relationship with GSI. Regardless of whether such testimony could otherwise constitute evidence of interference, Sanchez refused to end the relationship. Thus, no breach was induced and no damages caused.

There is no evidence offered in this case to prove that PEI interfered with any contracts between EC and GSI and third parties, or between EC and GSI. Thus, the evidence is legally insufficient to support the jury's finding of tortious interference. *See City of Keller*, 168 S.W.3d at 810. We sustain PEI's third issue.

## IV. Fiduciary Duty

By its fourth issue, PEI contends that EC and GSI cannot recover for breach of fiduciary duty based on a joint enterprise or on a relationship of trust and confidence. The License Agreement expressly provided that the only relationship between PEI and EC was that of licensor-licensee; no other relationship was created by the License Agreement. *Cf. Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 541 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (holding that the express terms of the contract precluded a finding of joint enterprise). Therefore, in this case, a joint enterprise or a confidential relationship must have been established outside of the License Agreement.

### A. Joint Enterprise

The jury found that PEI engaged in a joint enterprise with EC, GSI, or both. The charge instructed the jury as follows:

A joint enterprise exists if the persons concerned have: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

There is no evidence, however, establishing that an agreement, express or implied, existed outside the License Agreement. Moreover, even assuming the License Agreement provided the basis for EC's and GSI's position, a joint enterprise cannot exist as a matter of law between a licensee who has a pecuniary interest in profits and a licensor who has a pecuniary interest only in royalties since the necessary community of pecuniary interest in a common purpose is lacking. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 527–28 (Tex.2002) ("Although the [franchisors] stand to benefit financially from the suc-

cessful downstream marketing of their goods or services, their interests in those activities are not held in 'community' with the [franchisees] because they are not shared 'without special or distinguishing characteristics.' ").[8] Here, PEI's compensation under the License Agreement was solely in the form of royalties, precluding any finding of joint enterprise. Thus, we conclude the evidence is legally and factually insufficient to establish a joint enterprise imposing a fiduciary duty on PEI.

**B. Relationship of Trust and Confidence**

The jury also found that a relationship of trust and confidence existed between PEI and EC or GSI or both. The jury was instructed as follows:

> A relationship of trust and confidence existed if [EC or GSI] justifiably placed trust and confidence in [PEI] to act in the best interests of [EC or GSI]. [EC's or GSI's] subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence.

There is, however, no evidence of such a relationship. Sanchez testified that he "trusted" PEI and that their business dealings were always conducted "in the most friendly manner." Fink similarly testified that he trusted PEI and that "everyone was great friends." But subjective trust does not transform arms-length dealings into a fiduciary relationship. *Schlumberger*, 959 S.W.2d at 177; *see Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 301 (Tex.App.-El Paso 1996), *aff'd*, 966 S.W.2d 482 (Tex.1998) (providing that allegations that the defendant had promised to "take care of," "look

out for," and was "working for" the plaintiff were insufficient as a matter of law to establish a relationship of trust and confidence). The testimony in this case establishes that the parties had, at most, a friendly working relationship. The License Agreement did not create a relationship of trust and confidence, and there were no other circumstances creating any such special relationship between PEI and EC and/or GSI. *See Trans. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex.1995) ("A fiduciary or confidential relationship may arise from circumstances of the particular case, but it must exist prior to, and apart from, the agreement made the basis of the suit."). Although Sanchez had an ongoing business relationship with PEI, this, also, is insufficient as a matter of law. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex.1992) ("Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship."). Accordingly, we conclude the evidence is legally and factually insufficient to establish that a relationship of trust and confidence existed between PEI and EC or GSI or both.

**C. Partnership**

EC and GSI also argue that they pleaded that they were in a partnership with PEI, that PEI did not file a verified denial, and that under Texas Rule of Civil Procedure 93(5) a partnership was created by default; thus, it created a fiduciary relationship. *See* Tex.R. Civ. P. 93(5). However, rule 93 does not apply here. From pleadings filed by EC and

---

**8.** EC and GSI argue that this case is distinguishable from *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 527–28 (Tex.2002), because PEI retained rights to approve the quality of the Spanish Language edition. Such approval rights, however, do not distinguish *Wolff*. *See*

*id.* at 528 (explaining that "both parties to an agreement may have 'a common business interest,' 'a common pecuniary interest,' or both, despite lacking a community of pecuniary interest in the purpose").

GSI, it is clear they are asserting a special relationship of trust or confidence or a joint enterprise, not a true partnership, even though the language in the pleading asserts that they were in a "joint venture, joint enterprise, or partnership" with PEI. A partnership requires an agreement to share profits. *Schlumberger*, 959 S.W.2d at 176. However, their pleadings acknowledge that PEI was to receive "royalties arising from the business activities of Editorial and Grupo Siete," not profits. The License Agreement referenced in the pleadings also makes clear that PEI was entitled to royalties, not profits. Moreover, EC and GSI requested jury questions on special relationship and joint enterprise, not partnership. Where the pleadings as a whole reflect that a party—while using the term "partnership"—is in fact asserting a different relationship not covered by the rule, that rule does not apply. *See Zarsky Lumber Co. v. Guiberteau*, 270 S.W.2d 630, 632 (Tex.Civ.App.-San Antonio 1954, writ ref'd n.r.e.) ("[I]n view of all the facts plead[ed] herein, [the allegation] is one of joint adventure and not of partnership, and allegations of joint adventure do not have to be denied under oath."); *see also Cantu v. Holiday Inns, Inc.*, 910 S.W.2d 113, 116–17 (Tex.App.-Corpus Christi 1995, writ denied) (providing that pursuant to the "of record" exception in rule 93, a matter established by evidence in the trial court record appears "of record," so no verified denial is needed). Because joint enterprise and special trust relationships are not covered by rule 93, this rule does not apply, and the argument fails.

Having determined that there is no evidence to establish that a joint enterprise or a relationship of trust and confidence existed between PEI and EC or GSI or both, we conclude EC and GSI cannot recover for breach of fiduciary duty based on such relationships. We sustain PEI's fourth issue.

## V. Wrongful Disparagement

■ By its fifth issue, PEI contends that there is no evidence of wrongful disparagement. "The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987). The jury found for EC and GSI on this claim and awarded damages in the amount of $260,000 for lost profits in Mexico, $0 in the United States, and $0 in Latin America.

■ To support this wrongful disparagement claim, EC and GSI rely on the information in the media kit prepared by GSI and allegedly approved by PEI. EC and GSI argue that, through the media kit, PEI published false statements to third parties; false statements that damaged their business. The media kit, however, contained only inflated circulation numbers for the United States, not Mexico circulation numbers. The media kit did not address business in Mexico, which is the only market for which the jury found lost profits. The media kit related only to distribution in the United States, and the jury found no lost U.S. profits.[9] Representations in the media kit cannot, therefore, support disparagement damages in the form of lost profits in Mexico. We conclude, therefore, that there is no evidence offered in this case to prove this vital fact, and the evidence is, thus, legally insufficient to support the jury's finding of

---

**9.** EC and GSI do not complain on appeal of the failure of the jury to award any money for lost profits in the United States market.

wrongful disparagement. *See City of Keller*, 168 S.W.3d at 810. PEI's fifth issue is sustained.

## VI. Damages

The jury awarded EC and GSI $3,600,000 for out-of-pocket expenses, $500,000 for liabilities incurred, and $260,000 for lost profits in the Mexico market. The judgment ordered that EC and GSI should have and recover the sum of $4,360,000.

### A. Collective Damage Award

By its sixth issue, PEI first contends that the collective damages award is independently barred as a matter of law because the jury did not determine EC's damages and GSI's damages separately.[10] Construing this contention as a challenge to the jury charge, the standard of review is abuse of discretion which "occurs only when the trial court acts without reference to any guiding principle." *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990).

### 1. Preservation of Issue

We first address the contention raised by EC and GSI that PEI did not preserve this issue for our review. "A party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling." *In the Interest of B.L.D.*, 113 S.W.3d 340, 349 (Tex.2003) (citing *State

Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992)).

At the charge conference, PEI objected "to those damage questions being submitted together. There is only one blank to put in total damages for both of those parties, and we would object to that as it should be separated out." The trial court overruled PEI's objection. PEI's complaint was that EC and GSI are separate parties and their damages should be determined separately. We conclude that, with its objection, PEI made the trial court aware of its complaint, timely and plainly, and obtained a ruling. *See id.* Thus, PEI preserved error for our review.

### 2. Separate or Collective Damages

To support its position that separate, not collective damages, if any, should have been awarded, PEI relies on *Minn. Mining and Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 738–39 (Tex.1997), and *Mullen v. Roberts*, 423 S.W.2d 576, 578–79 (Tex. 1968). However, *Nishika* and *Mullen* are distinguishable from the present case and do not support this contention.

In *Nishika*, the supreme court certified to the Minnesota Supreme Court the question of whether the *Nishika* plaintiffs could recover damages jointly as a single economic unit. *See Nishika*, 953 S.W.2d at 738. The Minnesota Supreme Court held that they could not under Minnesota law. *See id.* That court, however, left

---

10. "FOR GSI" was written beside the $500,000 liabilities award and "FOR EDITORIAL" beside the $260,000 lost profits award. However, "[a] jury's marginal notations generally may not be considered on appeal." *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993); *see Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex.1995) (setting out that an appellate court "cannot consider the margin notations as separate damage awards for purposes of evidentiary review"); *First Nat'l Bank in Dallas v. Zim-

merman*, 442 S.W.2d 674, 678 (Tex.1969) (providing that the jury's "handwritten notation was not the jury's verdict; it merely reflected the jury's mental processes in arriving at their verdict.... The jury's reasons for reaching a particular verdict are irrelevant, at least in the absence of some overt act of misconduct."). Therefore, as the parties do not argue differently, for purposes of our review, we will not consider the margin notations as separate damage awards.

open for the Texas courts the procedural question of whether altering the damages award or a new trial was appropriate. *See id.* Therefore, the issue in *Nishika* was not whether the plaintiffs could recover damages jointly but whether the court should render or remand the case for a determination of proper damages. See *id. Nishika* provides no support for PEI in this instance.

In *Mullen,* the Texas Supreme Court concluded "the judgment should not be for an aggregate sum but should segregate and award to each the damages or relief to which he is properly entitled." Using the *Mullen* court's analysis, however, we reach a different result in this case. *See Mullen,* 423 S.W.2d at 579. The joint damage award and judgment in favor of EC and GSI conform with the pleadings, thus distinguishing our facts from those in *Mullen* where the judgement did not conform with the pleadings. *Cf. id.* The cross-claim and third party petition filed by EC and GSI specifically set out that "it is brought by [EC] and [GSI], jointly, against [PEI] based upon [PEI's] unjustified, improper, illegal, intentional, fraudulent, and negligent conduct, causing huge financial losses and potential economic ruin to [EC] and [GSI]." No claim or cause of action was asserted severally. Neither EC nor GSI claimed damages in separate sums on the alleged causes of action. *Cf. id.* at 578. Additionally, Texas Rule of Civil Procedure 40 authorizes the joinder in one action of multiple plaintiffs asserting any right to relief jointly. *See* Tex.R. Civ. P. 40; *see also Mullen,* 423 S.W.2d at 578.

Accordingly, acting with reference to the above guiding principles, we cannot conclude the trial court abused its discretion in not charging the damages separately. *See E.B.,* 802 S.W.2d at 649.

## B. Out–of–Pocket Damages

■ PEI next contends there is no legally or factually sufficient evidence to support the jury's award of $3,600,000 for out-of-pocket expenses, described in the jury questions as "[t]he amount of money spent by [EC and GSI] in reliance on the promises made by [PEI]." PEI complains that while the jury awarded $3,600,000 to EC and GSI as out-of-pocket expenses, their economic expert, Gilberto de los Santos, testified that EC and GSI incurred out-of-pocket expenses in the aggregate amount of $2,703,971. Thus, PEI argues that this is no evidence to support the jury's higher verdict award of $3,600,000. It further asserts that the evidence to support even the $2,703,971 amount, including de los Santos's testimony and that offered by Fink, is legally and factually insufficient evidence because it is conclusory and based on flawed methodology and unreliable data, or refers to Group Seven's out-of-pocket expenses,[11] perhaps not even related to the *Playboy* project, not GSI's expenses. PEI also contends Fink's testimony cannot constitute evidence of out-of-pocket damages because he testified only about the amount allegedly invested by GSI, without regard to offsetting revenues that were generated.

However, EC and GSI did provide some evidence of out-of-pocket expenses through their expert who testified as to "publishing rights" expense, GSI's expenses and investments in the project, EC's out-of-pocket expenses, and profit and loss histories. He relied on financial statements provided to him by Fink,[12] conversations with Fink, and records entered into evidence. Fink

---

11. Group Seven is GSI's parent company.

12. PEI also challenges the use of unaudited statements provided by Fink, statements PEI asserts had no bases in reality.

also testified that GSI brought in $4,000,000 in financing [13] and did not count on having to "use it all up just to stay in business to put out a Playboy magazine without enough copies to make any money." Without referring to supporting documentation, Fink testified that money was spent on launch parties, upgrading facilities, flying people back and forth, building a staff, and other business activities. He also testified that the company invested at least $2,500,000 in the business venture.

Based on the above, we conclude that there is legally sufficient evidence that EC and GSI suffered some out-of-pocket damages as a result of PEI's fraud, although there is no probative evidence supporting the entire amount of out-of-pocket damages awarded. *See City of Keller*, 168 S.W.3d at 810.

## C. Liabilities Incurred

In addition to the $3,600,000 awarded for out-of-pocket expenses, the jury awarded damages for liabilities incurred by EC or GSI in reliance on PEI's promises. PEI contends that the $500,000 award for liabilities incurred is duplicative of the out-of-pocket expenses award because it is included in the $3,600,000 award. Alternatively, PEI urges that the evidence is legally and factually insufficient to support this award for liabilities incurred.

■ De los Santos recognized that "out-of-pocket expenses" necessarily included amounts borrowed from third parties and then spent on the PEI project. Therefore, to the extent "liabilities incurred" included moneys borrowed from third parties and spent on the PEI project in this case, such award constitutes a double recovery and should be disregarded. *See Waite Hill Servs. v. World Class Metal Works*, 959 S.W.2d 182, 184–85 (Tex.

1998) (per curiam). However, the evidence also shows that Paramo, GSI's editor-in-chief, was owed $111,000, a salary amount set out in a contract for his services. The $111,000 was not money borrowed and then spent on the PEI project. It was a liability incurred; a liability supported by the evidence. We conclude this amount would not constitute a double recovery. Moreover, PEI notes that the records provided by EC and GSI establish that, at most, $125,000 went to GSI (of which only $89,000 was invested in EC). Thus, we conclude there is legally sufficient evidence that EC and GSI suffered some damages for liabilities incurred as a result of PEI's fraud, although there is no probative evidence supporting the entire amount awarded for liabilities incurred. *See City of Keller*, 168 S.W.3d at 810.

## D. Lost Profits

### 1. Direct Damages

■ PEI asserts that because lost profits and out-of-pocket expenses are remedies constituting alternative measures of damages, the jury's award of $260,000 for lost profits in the Mexico market cannot stand. The two alternative measures of damages are benefit-of-the-bargain (lost profits) and out-of-pocket measures. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 681 (Tex.2000) (citing, *e.g., Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998)). "Benefit-of-the-bargain damages are the difference between the value as represented and the value received." *Id.* "Out-of-pocket damages compensate a defrauded party for the difference between the value of that with which he or she has parted and the value actually received." *Id.* We have already concluded that there is legally sufficient

---

13. PEI asserts that Fink is referring not to GSI but to its parent company, Group Seven.

evidence to support an award for out-of-pocket expenses in this case. Therefore, to the extent the jury's award is for lost profits in the Mexico market, this award is an alternative measure of damages.[14]

### 2. Consequential Damages

 "When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable." *Formosa Plastics*, 960 S.W.2d at 49 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997)). "It is possible that, in the proper case, consequential damages could include foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation." *Id.*

 In their petition, EC and GSI sought "recovery against [PEI] for all damages they have sustained by their fraud and other wrongful conduct, that is their substantial business losses, lost profits, loss of credibility and profits in other ventures, and other related damages." EC and GSI prayed for actual damages,

any and all out-of-pocket losses or expenditures, and any and all lost profits/lost business opportunity damages, both with respect to the publication at issue and with respect to other business ventures and relationships. Construing the pleadings liberally, we conclude consequential damages in the form of foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation were properly pled. *See id.* Thus, this element of damages based on the fraud claim may have been recoverable in this case. PEI does not challenge the sufficiency of the evidence to support an award of consequential damages for lost profits, if any. Therefore, that issue is not before us.

### E. Disposition Regarding Damages

 While there is no probative evidence supporting the entire amount of damages awarded by the judgment, there is legally sufficient evidence that EC and GSI suffered some damages as a result of PEI's fraud. Because PEI contested the

**14.** PEI asserts there is no evidence of lost profits in the Mexico market. PEI complains that the only lost profits testimony came from de los Santos, whose testimony PEI contends is "wholly speculative and out of touch with reality." In this case, however, the evidence includes a table showing EC's profits from 1989 until 1998. While net losses are shown in 1994 and from 1996 to 1998, net profits are shown from 1989 to 1993 and in 1995, with the greatest net profit of $2.5 million in 1990. De los Santos used information from past development and existing conditions, economic indicators, and market and industry data to develop his opinions regarding lost profits. While the two-month baseline of actual production upon which he based his projected future revenues in Mexico is a relatively short period of time, it is a corresponding period of time upon which de los Santos could obtain data. Among other things, de los Santos utilized increases in monthly sales and increases in the target population of men,

ages 20–59, to determine lost profits. From this data, lost profits may be ascertained with a reasonable degree of certainty and exactness.

It is unclear, however, how the jury determined lost profits in Mexico, apart from lost profits in the United States, Puerto Rico, Venezuela, and the Conosur Region. When de los Santos transformed his revenue projections into profit projections, he did not specifically calculate lost profits for Mexico. Rather, his projections referenced the aggregate lost profits for Mexico, the United States, Puerto Rico, Venezuela, and the Conosur Region. Although the evidence does not support the specific award of lost damages the jury made, we conclude there is legally sufficient evidence that EC and GSI suffered some damages for lost profits in Mexico that were incurred as a result of PEI's fraud. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

issue of damages, we cannot render judgment for a lesser dollar amount. *See Formosa Plastics,* 960 S.W.2d at 49. Instead, we sustain issue six, reverse the trial court's judgment regarding the fraud claim, and remand for a new trial on liability and damages related to this claim. *See Fortune,* 52 S.W.3d at 682 (Tex.2000) (holding that where there is evidence of some fraud damages, but there is no evidence to support the full amount of damages found by the jury, remand for a new trial is the appropriate remedy); *Formosa Plastics,* 960 S.W.2d at 51 (holding that appellate court can remand for new trial when no evidence supports damages awarded but there is evidence of some damages); *Texarkana Mem'l Hosp. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997) (holding because plaintiffs presented legally sufficient evidence that some of the damages resulted from the complained of conduct, they should be afforded an opportunity to develop this evidence further); *Rente Co. v. Truckers Express, Inc.,* 116 S.W.3d 326, 335 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (finding evidence legally insufficient to support award, but sufficient to show plaintiff suffered some damage, court reversed and remanded for a new trial on liability and damages); *but see Springs Window Fashions Division, Inc., v. The Blind Maker, Inc.,* 184 S.W.3d 840, 889 (Tex.App.-Austin 2006, pet. filed) (holding legally and factually insufficient evidence to support award, but sufficient evidence to support some of the award and suggesting a remittitur *sua sponte* ). *See also* Tex.R.App. P. 44.1(b) (appellate court may not order separate trial solely on unliquidated damages if liability is contested); *Johnston v. McKinney Am., Inc.,* 9 S.W.3d 271, 284 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (stating appellate courts cannot remand as to damages only).

We decline to suggest a remittitur as urged, in the alternative, by PEI. Remittitur is not appropriate because we are remanding for a new trial on liability and damages regarding the fraud claim. *See* Tex.R.App. P. 44.1(b); *see also Rente,* 116 S.W.3d at 335. Moreover, in the context of this case, we conclude that the interests of justice require a remand for another trial on the fraud claim and damages related to that claim. *See* Tex.R.App. P. 43.3(b) (providing that appellate court may remand for another trial when interests of justice require); *Johnston,* 9 S.W.3d at 284 (same).

## VII. Pre- and Post–Judgment Interest

■ By its eleventh issue, PEI contends it is entitled to new judgment interest rates if any part of the judgment is affirmed. PEI argues that amended section 304.003 of the Texas Finance Code which lowers the post-judgment interest floor to five percent should apply to the judgment in this case. *See* Tex. Fin.Code Ann. § 304.003(c) (Vernon Supp.2005) (providing for post-judgment interest rate of five percent a year if prime is less than five percent).

House Bill 4 and House Bill 2415, the bills that amended section 304.003,[15] set out that the revisions apply to a case in which "a final judgment is signed or is subject to appeal on or after the effective date" of the acts. *Bic Pen Corp. v. Carter,* 171 S.W.3d 657, 677 (Tex.App.-Corpus Christi 2005, pet. filed) (quoting Act of June 2, 2003, 78th Leg., R.S., H.B. 4,

---

**15.** "House Bills 4 and 2415 amended section 304.003(c) of the finance code, reducing the effective post-judgment interest rate from ten to five percent." *Bic Pen Corp. v. Carter,* 171 S.W.3d 657, 677 (Tex.App.-Corpus Christi 2005, pet. filed) (citing Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.04 (H.B. 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (H.B. 2415)).

§ 6.04 (H.B. 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (H.B. 2415)). "The provisions therefore apply if the judgment in this case was signed on or after the effective date of either act, or if the judgment became subject to appeal, that is, capable of being appealed, on or after the effective date of the act." *See id.* at 677–78 (citing *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 255 (Tex. App.-Texarkana 2005, no pet.); *see also City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet.); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 865 (Tex. App.-Fort Worth 2003, pet. denied)).

The effective date of September 1, 2003, for House Bill 4 is not in dispute, and we have recently determined that House Bill 2415 also became effective on that date. *See id.* at 678–79. The judgment in this case was signed and also became capable of being appealed on October 24, 2002. *See id.* at 678. That date controls the application of section 304.003(c) in this matter. *See* Tex. Fin.Code Ann. § 304.003(c) (Vernon Supp.2005). Therefore, because the judgment was not signed on or after the effective date of the acts and because it did not become subject to appeal on or after the effective dates of the acts, neither House Bill 4 nor House Bill 2415 applies to the judgment in this case. PEI is not entitled to new judgment interest rates. We overrule the eleventh issue.

### VIII. Exhibit 248A

In its seventh issue, PEI complains that the trial court erred when it inadvertently failed to provide exhibit 248A to the jury during deliberations. The exhibit was a sixteen-page transcript of direct testimony provided by Siegel in a separate California lawsuit.[16] In that case, Siegel testified that lack of funding from Admiral Capital Corporation, an investor in Group Seven, GSI's parent corporation, caused the failure of the PEI project. Because Siegel's testimony directly contradicted allegations in the present lawsuit that PEI caused the project to fail, PEI contends the trial court erred in failing to send the requested exhibit to the jury room.

The trial court, however, did not refuse to provide the exhibit to the jury as required by rule 281. *See* Tex.R. Civ. P. 281 (providing that "[t]he jury may, and on request shall, take with them in their retirement ... any written evidence"); *see also First Employees Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex.1983) (holding rule 281 "is mandatory and ... the trial court is required to send all exhibits admitted into evidence to the jury room during the deliberations" even in the absence of a requests by jurors or counsel). The bill of exception signed by the trial court set out that when the first and second questions came out from the jury asking for Siegel's testimony, the trial court met in chambers with all attorneys regarding the exhibit. Assuming that the jurors had all exhibits and after identifying the exhibit that contained the requested information as number 248A, the trial court informed the jurors that the material they were seeking was contained in exhibit 248A, an exhibit which had been admitted into evidence. There is no indication in the record that, after receiving that information, the jurors informed the trial court that the exhibit was not found. Based on these facts, we cannot conclude that the action of the trial court was error.

---

**16.** *See Admiral Capital Corp. v. Group Seven Communications, Inc., Paul Siegel, Robert Byer, and Jonathan Fink,* No. SACV 99– 00198–DOC(EEx) (U.S. D. for the W. Div. C.D. of Cal., April 1, 1999).

■ Moreover, even assuming the trial court erred in inadvertently failing to send exhibit 248A to the jury room upon request, we conclude from an examination of the entire record that reversible error is not shown. *See* TEX.R.APP. P. 44.1(a). During the trial, both counsel for EC and counsel for PEI had an opportunity and did, in fact, read excerpts from exhibit 248A, Siegel's California trial testimony, into the record. The jury heard the excerpts read at the time the exhibit was introduced into evidence. EC's counsel read testimony concerning how, after entering into an agreement with Admiral for funding, its president wanted a change of terms and conditions. This was not acceptable to Siegel who then asked for a release from the agreement so that he could pursue other financing which was at that time "surely needed." PEI's counsel also read excerpts that provided information regarding the success of Group Seven through 1997 and statements that the success would have been much greater had Admiral funded as agreed. From the excerpt read by PEI's counsel, Siegel testified that, because of the exclusivity of the agreement with Admiral, he lost other opportunities to raise capital. The following exchange was also read to the jury:

Q: As a result of the failure of Admiral to make the additional investment in Group Seven, how has Group Seven been damaged?

A: The Playboy license was terminated because of lack of funding.

Thus, the jury was aware of Siegel's statements regarding Admiral's involvement in the matter.

In addition, when called to testify in this case, Fink, GSI's corporate representative, was asked questions about the California lawsuit and Admiral's agreement with Group Seven to provide investment monies for a variety of projects. Fink testified that the purpose of raising money from Admiral was to provide extra funding for the company . . . because it was "starting to run short of its cash, based on the projections of . . . its time line [to launch the magazine] starting to get stretched out." In further questioning of Fink, PEI counsel also read the following:

As set forth in the accompanying declaration of Bob Byer[, GSI's director, secretary and treasurer,] based on Admiral's conduct, Group Seven has lost the licenses held with Playboy. . . . Admiral failed to fully fund its 2.1 million equity obligation causing Group Seven damages in excess of those sought by Admiral. Group Seven is now involved in litigation with . . . Playboy . . . as set forth in the Siegel declaration. The lack of admiral funding has prevented the . . . publishing and distributing the company's . . . Spanish language Playboy through the [GSI] subsidiary to the Hispanic marketplace in the United States and throughout Central and South America. The lack of funding has deleteriously impacted Group Seven's relationship.

Based on the above, the exhibit at issue was cumulative of other evidence the jury considered. Therefore, even if the exhibit had been excluded from the jury's deliberations at trial, a new trial would not be ordered. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 227 (Tex. 2001) (holding error in the admission or exclusion of evidence is harmless if cumulative). The error was not such as would probably cause the rendition of an improper judgment or prevent PEI from presenting its case to this Court. *See* TEX.R.APP. P. 44.1(a). PEI's seventh issue is overruled.

### IX. Realignment of EC and GSI as Plaintiffs

■ By its eighth issue, PEI contends the trial court improperly realigned EC

and GSI as plaintiffs for purposes of final argument because Gongora was the primary plaintiff and because PEI, EC, and GSI were all equally positioned as defendants/cross-plaintiffs. Texas Rules of Civil Procedure 266 and 269(a) provide for a party's right to open and close argument. *See* Tex.R. Civ. P. 266, 269(a). Rule 266 begins with the following words: "Except as provided in Rule 269 the plaintiff shall have the right to open and conclude both in adducing his evidence and in the argument." *Id.* at rule 266. Rule 269(a) sets out, in effect, that the party having the burden of proof of the whole case or on all matters which are submitted by the charge shall be entitled to open and conclude the argument. *Id.* at rule 269(a). It also provides "where there are several parties having separate claims or defenses, the court shall prescribe the order of argument between them." *Id.* In this case, as noted by PEI above, Gongora was the primary plaintiff and PEI, EC, and GSI were all equally positioned as defendants/cross-plaintiffs; thus, there were several parties with separate claims or defenses. The trial court shall prescribe the order of argument in such a case. *See id.* Thus, the trial court did not err in allowing EC and GSI to open and close final argument.

PEI also asserts this alleged error is particularly egregious because, when the case was earlier removed to federal court, EC and GSI strenuously argued that they should not be realigned as plaintiffs for purposes of federal removal jurisdiction. It claims the trial court should have held that EC and GSI were estopped and otherwise should have been precluded from arguing that they should be realigned as plaintiffs after the case was remanded to

state court. *See Gen. Agents Ins. Co. v. Home Ins. Co.*, 21 S.W.3d 419, 427 (Tex. App.-San Antonio 2000, pet. dism'd) (judicial estoppel "precludes a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or a prior litigation"). Interestingly, our review of the record reveals that PEI, itself, argued that EC and GSI should be realigned as plaintiffs in that same earlier proceeding in an effort to remove the case to federal court. Thus, using this analysis, PEI, too, should be estopped from taking its present position on this issue. Under the facts of this case, we cannot conclude this argument supports PEI's position. We overrule this eighth issue.

## X. Breach of Contract and Excuse [17]

By its first issue, PEI contends that EC and GSI cannot recover for breach of the License Agreement. PEI also contends, by its ninth issue, that EC and GSI, as EC's assignee under the License Agreement, are liable for breach of contract as a matter of law and that there is no evidence that EC's failure to comply with the License Agreement was excused. However, because of our disposition of the fraud issue and the interrelated nature of the breach of contract and fraud claims, we will not address these contentions at this time. *See* Tex.R.App. P. 43.3(b) ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when . . . the interests of justice require a remand for another trial."); *id.* at rule 47.1 (setting out that a written opinion must be as brief as practicable addressing every

17. Without additional briefing, PEI identifies in the "Issues Presented" section of its brief a tenth issue; that the evidence is legally and factually insufficient to support any of the jury's liability and damage findings chal-

lenged by PEI in its brief. We have already, however, discussed sufficiency issues that were adequately briefed. Therefore, we need not address PEI's tenth issue.

issue raised and necessary to final disposition of the appeal).

## XI. Conclusion

Accordingly, we reverse the trial court's judgment, in part, and render judgment that EC and GSI take nothing on their tortious interference, fiduciary duty, and wrongful disparagement claims. We reverse the judgment of the trial court, in part, and remand the parties' fraud claims to the trial court for a new trial. In the interest of justice, we also remand the parties' contract claims to the trial court for a new trial. *See id* at rule 43.3(b).