NUMBER 13-09-00083-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS





CORPUS CHRISTI - EDINBURG


 


BECKHAM RESOURCES, INC. 

AND KLA ENERGY, INC., Appellants,


v.
 


MANTLE RESOURCES, L.L.C., WILLIAM F. MILLER,

C.F. FUNDS, INC., AND JIM C. SNYDER, Appellees.

 


On appeal from the 267th District Court 


of Refugio County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Garza 


Memorandum Opinion by Justice Rodriguez



 This appeal arises from a dispute over an oil and gas lease in Refugio County,
Texas. Appellants Beckham Resources, Inc. and KLA Energy, Inc. complain of the
motions for summary judgment and motion for instructed verdict granted in favor of
appellees Mantle Resources, L.L.C., William F. Miller, C.F. Funds, Inc., and Jim C. Snyder
and which, when considered together, disposed of all of appellants' claims against
appellees. (1) By four issues, (2) Beckham argues that the trial court erred in: (1) granting
Mantle's motion for summary judgment on Beckham's claim that Mantle breached certain
provisions of the joint operating and exploration and development agreements between the
parties; (2) granting Mantle's motion for summary judgment on Beckham's claim that
Mantle breached a certain letter agreement between the parties and breached a fiduciary
duty owed; (3) granting Mantle's motion for instructed verdict on Beckham's fraud and
negligent misrepresentation claims; and (4) awarding attorneys' fees to Mantle where no
evidence supported the award and the fees were not segregated. We affirm. 

II. Background

A. The Scanio-Shelton Lease

 Beckham is a company that develops oil and gas properties. In 1999, Beckham
acquired a lease in Refugio, Texas, from the Scanio-Shelton family (the Lessors). 
Beckham developed the property, which resulted in oil and gas production and revenue for
both Beckham and the Lessors. Beckham then sold ten percent of its interest in the
Scanio-Shelton lease to KLA. For reasons not entirely clear from the record, a dispute
over the lease arose between Beckham and the Lessors. The dispute was resolved
without litigation, but the relationship between Beckham and the Lessors was strained from
that point forward.

B. Beckham and Mantle's Relationship

 In February 2004, Beckham sold seventy-five percent of its interest in the Scanio-Shelton lease to Mantle. As consideration for the acquisition, Mantle paid Beckham
$395,000 and agreed to drill five new wells on the property. Mantle was responsible for
the up-front costs of the five new wells; after that, the proceeds were shared between the
parties according to their respective ownership shares--i.e., seventy-five percent to Mantle
and twenty-five percent to Beckham. The five wells were completed without controversy.

 Beckham and Mantle's relationship was governed by two agreements--an
exploration and development agreement (the exploration agreement) and a joint operating
agreement (the JOA). The JOA outlined the manner in which the parties would finance
wells on the leased property after the first five that were drilled as consideration. The
parties agreed that new operations would be subject to a "non-consent" clause, which
meant, in short, that if one party proposed an operation, the other party had a choice to
participate or not. Under the non-consent clause, if one party had chosen not to
participate, the party who proposed the new operation would bear full responsibility for the
up-front costs of drilling the well. The participating party would then be allowed to recover
its costs out of production from the well until a stated percentage--here, 200%--was
recovered. The percentage was meant to be a penalty to the non-consenting party. After
the participating party recovered this amount, the non-consenting party would begin to
receive its share of production from the well.

 The exploration agreement contained an "area of mutual interest" clause (the AMI),
which governed a large area around the lease and provided that if either party acquired an
oil and gas interest within that defined area, the acquiring party was required to offer the
other party a share of that acquisition in proportion to its ownership under the original
lease. The AMI read, in relevant part, as follows:

 Any Party acquiring an "oil and gas interest" within the AMI shall notify the
other Party in writing of such acquisition, which notice shall include all
pertinent terms of such acquisition (the "Notice"). For purposes of this
Agreement, an oil and gas mineral interest shall include any leasehold,
working interest, overriding royalty interest, mineral interest, royalty interest,
farm-out, farm-in, or any other oil and gas interest of any nature or kind. The
non-acquiring Party may elect to participate for its proportionate share in the
acquisition by giving written notice of its election to the acquiring Party within
ten (10) days from receipt of the Notice. A party electing to participate in an
acquisition shall make payment of its proportionate part of all acquisition
costs within twenty (20) days of its election. A Party's failure to timely elect
or make its payment thereafter shall be deemed an election not to participate
in the acquisition.


C. The May 2004 Lease

 In May 2004, Mantle entered into a new lease with the Lessors (the May 2004
lease), and pursuant to the terms of the exploration agreement, assigned Beckham 
twenty-five percent of its interest in the new lease. (3) However, to obtain the Lessors'
consent to the new lease in light of the strained relationship between Beckham and the
Lessors, Mantle agreed to certain conditions in the lease that would eliminate any contact
between Beckham and the Lessors and allow Mantle the right to execute a release on
Beckham's behalf regarding its interest in the lease. Specifically, the May 2004 lease
contained the following language:

 This Lease may not be assigned by the Lessee [Mantle] . . . without the
express written consent of the Lessor . . . . Should any assignment as to all
or any part of the leasehold, or any interest therein, or as to any segregated
acreage covered by the Lease, be made by Lessee, or should any
subsequent assignment be made by any assignee, the Lessee shall have the
right to execute and deliver a release or partial release of the Lease in
accordance with the other release provisions of this Lease without the joinder
or approval of any other leasehold interest owner. . . . Any such action by
the Lessee . . . shall be as the agent and attorney-in-fact for all other
leasehold interest owners at the time of granting any release or partial
release. It is agreed that the purpose of naming and appointing the Lessee
. . . as the agent and attorney-in-fact is to allow the Lessor to look to only one
party for execution and delivery of any release . . . . Each assignee of an
interest in the leasehold estate shall be bound by this provision and grants
to the Lessee . . . the right to release, in whole or in part, an assignee's
interest, as may be deemed necessary and proper by the Lessee . . . in
accordance with other provisions of this Lease.


This language was used in Mantle's assignment to Beckham of its twenty-five percent
interest in the lease. (4)

 This arrangement caused Beckham some anxiety. To ameliorate that concern,
Mantle sent Beckham a letter in February 2005. The letter stated that the restrictions on
assignment were "compelled by the trade with the Lessors in order to obtain consent to the
assignment of your [Beckham and KLA] interest in the Lease." The letter then provided
that:

 In order to assure each of you [Beckham and KLA] that no action will be
taken by Mantle . . . which is inimical to the interests of either of you, and in
consideration of your respective continued participation in the exploration
and development of the lands covered by the Lease, Mantle covenants and
agrees as follows:


 1. Any action to be taken by Mantle which affects the leasehold
interest of either Beckham or KLA shall be implemented in
accordance with the terms and provisions of the applicable
operating agreement which governs operations on the Lease.


 2. If a proposed action which affects the leasehold interest of
either Beckham or KLA is not contemplated by the operating
agreement, then Mantle will not act without first having
discussed the proposed action with each of Beckham and KLA
and obtained their respective consents to such action prior to
its being taken.


D. The Beginning of the End

 In April 2005, Mantle proposed drilling a deep well, which would be known as
Scanio-Shelton No. 6, by sending Beckham an authority for expenditure (AFE) inquiring
as to whether Beckham would like to participate. Beckham chose to go non-consent. 
Mantle informed Beckham that it would be unable to complete the well without Beckham's
participation. Beckham stood firm on its election not to participate. 

 At this same time, the May 2004 lease was nearing expiration because no new well
had been drilled on the property for some time; thus, under the continuous drilling clause,
the lease would expire on July 28, 2005. Mantle negotiated an amendment to the lease,
changing the continuous drilling interval from 120 to 180 days, which extended the
expiration date to September 28, 2005. The events that followed are disputed by the
parties.

 In sum, Beckham claims that in the summer and fall of 2005, Mantle entered secret
negotiations with the Lessors to cut Beckham out of future operations on the lease. 
Beckham asserts that Mantle never told Beckham it was not going to drill the deep well that
was initially proposed in April 2005 and, as a result, lose the May 2004 lease. Rather,
Beckham contends that it was assured by Mantle that Mantle was obtaining an extension
of the lease with the Lessors and, in reliance on this representation, took no independent
action to protect its interests. Beckham claims that it had a meeting with Mantle on
October 4, 2005, at which time Mantle confirmed that the Lessors had agreed to an
extension in exchange for the parties' agreement to construct a new road on the lease
property; Beckham's share of this cost would have been $7,500. Beckham supports its
version of the facts--that Mantle colluded with the Lessors to block Beckham out of the
lease--with a letter sent by Mantle to the Lessors on the same date as Beckham's meeting
with Mantle, which reads, in relevant part, as follows:

 The lease acquired by Mantle Resources, LLC, . . . (the "Original
Lease") has terminated . . . . The termination was not entirely unexpected
or unintended by Mantle Resources . . . . Mantle . . . had proposed a deep
test on the lands covered by the lease, but Beckham Resources and [KLA],
who owned interests in the lease, had elected not to participate in the
proposed operation. This put a terrible burden on . . . Mantle, which would
have been required to bear all of the costs of the well, subject to a payout of
only 200% of what it cost to drill the well. This was inequitable and
undesirable. . . .


 . . . .


 The new lease (the "New Lease") is intended to track the Original
Lease with a few exceptions described as follows:


 . . . .



 KEY: The consideration for the New Lease is the obligation to
undertake the drilling of a well to a depth in excess of 9,000
feet below the surface. Making this well the consideration for
the lease precludes Beckham and [KLA] from electing not to
participate in the well if they desire to own any interest in the
new lease. If they do not elect to join in the well, then we shall
proceed with the New Lease. By failing to pay their respective
shares of the required well, they are precluded from owning
any interest in the New Lease, and the non-consent provisions
of the applicable operating agreement do not come into play. 
If they do elect to join, we may abandon the effort to acquire a
new lease and simply seek a renewal and extension of the
Original Lease . . . .


 Mantle asserts that it never told Beckham it had obtained the Lessors' actual
agreement to an extension; instead, Mantle claims it merely told Beckham that it was
negotiating with the Lessors for a possible extension. Further, Mantle contends that
Beckham understood that the Scanio-Shelton No. 6 well was not viable without Beckham's
participation but that Beckham was hoping that Mantle would nonetheless proceed so that
Beckham could avoid the risks of investing while still reaping the benefits after Mantle
recouped its 200% under the penalty clause of the non-consent provision. Mantle claims
that it had no obligation to keep Beckham apprised of the exact nature of its negotiations
with the Lessors.

E. The October 2005 Lease

 Mantle acquired a new lease with the Lessors with an effective date of October 18,
2005 (the October 2005 lease). The consideration for the lease was Mantle's agreement
to drill a deep well on the property. (5) The October 2005 lease was meant to convey an
interest in only the deep well rights on the property. To that end, the October 2005 lease
expressly recognized that the May 2004 lease still existed with regard to any earned
acreage and depths that had been attained under that lease.


 On October 26, 2005, Mantle sent Beckham a letter informing Beckham that the
May 2004 lease had terminated, that Mantle had "negotiated a new lease covering the
deep rights under" the May 2004 lease, and that: 

 . . . [t]his letter is notice of the intention to drill a well intended to penetrate
a depth of 10,000 feet, more or less.


 The drilling of this well is a part of the consideration for the purchase of the
new lease. All parties desiring to own any interest in the new lease (i.e. the
deep rights) must participate in the proposed well. Failure to participate in
the proposed well . . . will mean that the non-consenting party has not shared
in the consideration for the purchase of the new lease under the terms of the
applicable Area of Mutual Interest Agreement [the AMI]. Accordingly, a party
not sharing in the purchase terms of the lease does not own any interest
therein. We bring this to your attention so that there will be no
misunderstanding regarding your election as to participate or not.


An AFE for the estimated costs of the deep well was attached to the letter. The total
estimated cost for the well was $1,135,000; Beckham's share for participating would be
$255,375. Beckham did not respond to the October 26, 2005 notice. Mantle sent
subsequent letters on December 6, 2005, December 30, 2005, January 3, 2006, and
January 6, 2006, notifying Beckham of the October 2005 lease and offering Beckham the
opportunity to participate. It is undisputed that Beckham declined the offers communicated
by all of the letters. Beckham maintained that Mantle's offers were premature because the
acquisition cost of the new lease--one of the "pertinent terms" required to be included
under the AMI--was not ascertainable until the well had actually been completed. 
Beckham claimed that the estimated costs communicated by the AFEs attached to
Mantle's letters did not comply with requirements of the AMI provision that all "pertinent
terms" of the proposed acquisition be set forth in the notice.


 To finance the deep well, Mantle sold an interest in the October 2005 lease to Miller,
C.F. Funds, and Snyder. Their agreement, dated December 1, 2005, included the
following caveat:

 It is understood and agreed by each of the Participants that the interests
being acquired by them in the Test Well and the Deep Rights Lease are
attributable to an interest to which certain third parties are entitled, but have
waived their right to participate. Whether these parties have, in fact, waived
their rights may be the subject of litigation. In the event that it is later
judicially determined that such third parties are after all entitled to acquire
their respective interests in the Deep Rights Lease, despite their having not
participated in the drilling of the [deep well], each of Participants shall be
required to divest itself of his or its interest in the Test Well and Deep Rights
Lease . . . . Although Mantle . . . believe[s] that the third parties have
effectively waived their rights to acquire any interest . . . as a result of their
refusal to join in the drilling . . . when it was being undertaken (rather than
after it has been drilled), the favorable outcome of any litigation brought to
test the issue cannot be guaranteed . . . .


 In January 2006, Mantle commenced drilling on the Scanio-Shelton No. 6 well, the
deep well that served as consideration for the October 2005 lease. It reached a depth of
9,000 feet in mid-February 2006.

F. The Litigation

 On April 12, 2006, Beckham sued Mantle for breach of contract and breach of
fiduciary duty. Specifically, Beckham alleged that Mantle had breached: (1) the AMI
provision of the exploration agreement; (2) the non-consent provision of the JOA; (3) its
promise in its February 2005 letter to take no action "inimical" to Beckham's interests; and
(4) its fiduciary duty to Beckham that was allegedly created by the May 2004 lease
assignment, in which Mantle undertook to deal exclusively with the Lessors on Beckham's
behalf. Beckham filed a motion for partial summary judgment on May 17, 2007, arguing
that Mantle had breached the AMI provision of the exploration agreement as a matter of
law because its offers to Beckham to participate in the October 2005 lease did not comply
with the requirements of the provision. (6) By its motion for summary judgment, Beckham
sought specific performance of a proper offer to participate in the wells drilled under the
October 2005 lease and a declaratory judgment that the October 2005 lease is governed
by the JOA, thus giving Beckham its right to "go non-consent" to the new deep wells. 
Mantle filed a response and cross-motion for partial summary judgment, arguing that it
complied with the AMI provision as a matter of law. On September 14, 2007, the trial court
denied Beckham's motion and granted Mantle's.

 After this first round of dispositive motions, Beckham amended its petition to add
claims for fraud and negligent misrepresentation. Thereafter, Mantle filed a motion for
summary judgment on Beckham's claims for breach of the February 2005 letter agreement,
breach of fiduciary duty, fraud, and negligent misrepresentation. Beckham filed a cross-motion for partial summary judgment, arguing that a fiduciary duty existed as a matter of
law. On April 16, 2008, the trial court denied Beckham's cross-motion and partially granted
Mantle's motion, disposing of all but Beckham's fraud and negligent misrepresentation
claims. Those claims were tried to a jury in September 2008. (7) At the close of Beckham's
case, however, the trial court granted an instructed verdict in favor of Mantle. Based on
testimony by Mantle's attorneys, the trial court awarded Mantle $376,467.97 in attorneys'
fees. This appeal ensued. 


II. Discussion

A. Motions for Summary Judgment

 By its first and third issues, Beckham complains that the trial court erred in granting
summary judgment in favor of Mantle and denying Beckham's motions for summary
judgment on its various breach of contract and fiduciary duty claims.

1. Standard of Review

 In a traditional summary judgment, the issue on appeal is whether the movant met
the summary judgment burden by establishing that no genuine issue of material fact exists
and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Sw.
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002). In reviewing a summary
judgment, we consider the evidence in the light most favorable to the nonmovant,
accepting as true all evidence favorable to the nonmovant, indulging every reasonable
inference, and resolving any doubts in the nonmovant's favor. Grant, 73 S.W.3d at 215. 
"A party moving for summary judgment must establish its right to a summary judgment on
the issues expressly presented to the trial court by conclusively proving all elements of its
cause of action or defense as matter of law." Elliot-Williams Co. v. Diaz, 9 S.W.3d 801,
803 (Tex. 1999) (citations omitted). A defendant is entitled to summary judgment if it
conclusively negates at least one essential element of the plaintiff's cause of action or
establishes all the elements of an affirmative defense. Am. Tobacco Co., Inc. v. Grinnell,
951 S.W.2d 420, 425 (Tex. 1997). The summary judgment movant has conclusively
established a matter if reasonable people could not differ as to the conclusion to be drawn
from the evidence. See City of Keller v. Wilson, 168 S.W.3d 802, 816 (Tex. 2005). "When
a trial court's order granting summary judgment does not specify the grounds relied upon,
the reviewing court must affirm summary judgment if any of the summary judgment
grounds are meritorious." FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872
(Tex. 2000) (citing Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995)). 

 Although a party generally cannot appeal the denial of a motion for summary
judgment, when both sides move for summary judgment and the trial court grants one
motion and denies the other, the unsuccessful party may appeal both the prevailing party's
motion and the denial of its own. Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.,
253 S.W.3d 184, 192 (Tex. 2007). In such a case, the appellate court should review both
sides' summary judgment evidence, determine all questions presented, and render the
judgment the trial court should have rendered. Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005); FM Props. Operating Co., 22 S.W.3d at 872. 

2. Beckham's Motion for Summary Judgment

 On May 17, 2007, Beckham filed the first motion for summary judgment in the case,
arguing that Mantle had breached the parties' exploration agreement as a matter of law
when its offer to appellants to participate in the October 2005 lease did not comply with the
AMI provision of the exploration agreement. (8) In response, Mantle filed a cross-motion for
summary judgment claiming that Beckham did not prove all elements of the same claims,
which was granted by the trial court and disposed of Beckham's claim for breach of the
exploration agreement and JOA. By its first issue, Beckham complains that the trial court
erred by denying its motion and granting Mantle's.

 To recover for breach of contract, a plaintiff must prove: (1) the existence of a valid
contract; (2) performance or tendered performance by the plaintiff; (3) breach by the
defendant; and (4) harm to the plaintiff as a result of the breach. Adams v. H & H Meat
Prods., Inc., 41 S.W.3d 762, 771 (Tex. App.-Corpus Christi 2001, no pet.). With regard
to the interpretation of the contract, the parties here both contend--and we agree--that the
AMI provision is unambiguous; they merely offer different interpretations of its meaning. 
See Dynegy Midstream Servs., L.P. v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009)
("A contract is not ambiguous simply because the parties disagree over its meaning"). 
Thus, our primary concern in construing the contract is to ascertain and give effect to the
parties' intentions as expressed in the document. Frost Nat'l Bank v. L & F Distribs., Ltd.,
165 S.W.3d 310, 311-12 (Tex. 2005). We consider the entire writing and attempt to
harmonize and give effect to all the contract's provisions so that none are rendered
meaningless. Id. at 312; J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003). Contract terms are given their plain, ordinary, and generally accepted meaning
unless the instrument shows the parties used them in a technical or different sense. 
Dynegy Midstream Servs., L.P., 294 S.W.3d at 168; Heritage Res., Inc. v. Nations Bank,
939 S.W.2d 118, 121 (Tex. 1996).


 The AMI provision of the exploration agreement creates an obligation in any party
who acquires a new "oil and gas mineral interest" within a defined land area surrounding
the May 2004 lease property to offer the other party the opportunity to participate in that
new acquisition for its proportionate share. To comply with the AMI, the AMI sets out that
the acquiring party must send the other party written notice of the acquisition that includes
"all pertinent terms" of the acquisition. The other party elects to participate by "giving
written notice" to the acquiring party within ten days of receiving the notice. If the other
party elects to participate, it is required to then pay its proportionate share of "all acquisition
costs" within twenty days of its election. The AMI expressly provides that a party's "failure
to timely elect or make its payment thereafter shall be deemed an election not to
participate in the acquisition."

 It is undisputed that the October 2005 lease was an "oil and gas mineral interest"
as defined by the AMI and was within lands covered by the AMI. Beckham and Mantle's
dispute centers around whether Mantle's notices to Beckham--i.e., the October 26, 2005,
December 6, 2005, December 30, 2005, January 3, 2006, and January 6, 2006
letters--sufficed to trigger Beckham's right to elect to participate and thereafter make
payment of its share of the acquisition costs. 

 Beckham argues that Mantle's offers to participate in the October 2005 lease did not
comply with the AMI provision of the exploration agreement because the notice letters
contained only the estimated costs of the well, rather than the actual acquisition costs,
which Beckham contends were a "pertinent term" as required by the AMI provision. 
Beckham asserts that Mantle breached the AMI provision because it did not send notice
or an offer to participate to Beckham once the acquisition costs became known and
ascertainable when the well reached 9,000 feet in February 2006. 

 Mantle argues that the October 2005 lease required the lessees to "absorb all the
financial risk of drilling the initial deep well." To that end, Mantle contends that its letters
to Beckham contained "all pertinent terms" of the acquisition, including specific discussions
of the consideration for the lease being the agreement to drill a deep well, copies of the
October 2005 lease, AFEs for the estimated drilling costs, and diagrams showing the
proposed well location. We agree. To participate as a lessee, Beckham was required,
upon receipt of the notice letter from Mantle, to send Mantle a written election and timely
payment of its proportionate share of the acquisition costs. Mantle asserts that the AMI
provision does not require that acquisition costs of "any new 'oil and gas mineral interest'
be stated in the form of a liquidated sum" but merely that Beckham be informed of the
terms for its participation--i.e., that Beckham would be responsible for its share of the up-front costs of the consideration well, which was the acquisition cost of the October 2005
lease. We believe this is the correct interpretation of the AMI provision of the exploration
agreement. Thus, Mantle complied with the requirements of the AMI provision as a matter
of law. See Grinnell, 951 S.W.2d at 425 (holding that a defendant is entitled to summary
judgment if it conclusively negates one essential element of a plaintiff's claim). It sent
Beckham multiple written notices of its acquisition of the May 2005 lease, offering
Beckham the opportunity to participate. It is undisputed that Beckham never elected to
participate in writing or made payment of its proportionate share of the acquisition costs. 
Under the terms of the AMI, Beckham's "failure to timely elect or make its payment" was
an election not to participate in the acquisition of the October 2005 lease. See Dynegy
Midstream Servs., L.P., 294 S.W.3d at 168 (requiring the reviewing court to give effect to
the plain and ordinary meaning of contract terms). Thus, Beckham's claim for breach of
the AMI provision of the exploration agreement fails as a matter of law, and we conclude
that the trial court did not err in granting Mantle's motion for summary judgment regarding
the AMI provision and denying Beckham's motion. See Tex. Mun. Power Agency, 253
S.W.3d at 192; Dorsett, 164 S.W.3d at 661. Beckham's first issue is overruled.

3. Mantle's Motion for Summary Judgment

 On December 5, 2007, Mantle filed its motion for summary judgment arguing that
Mantle did not breach the February 2005 letter agreement between the parties and that
Mantle did not owe or breach any fiduciary duty with regard to Beckham. Beckham filed
a cross-motion for partial summary judgment arguing that Mantle owed Beckham a
fiduciary duty as a matter of law. The trial court granted Mantle's motion and denied
Beckham's cross-motion. By its second issue on appeal, Beckham complains that the trial
court erred in granting Mantle's motion for summary judgment and denying its partial cross-motion because (1) fact issues remain on the claim for breach of the letter agreement, and
(2) Mantle owed Beckham a fiduciary duty as a matter of law and fact issues remain as to
Mantle's alleged breach of that duty.

a. Breach of the Letter Agreement

 The February 2005 letter agreement provided that, "in order to assure [Beckham]"
that Mantle will take no action "inimical" to Beckham's interests, Mantle "covenants and
agrees" that (1) any action taken by Mantle affecting Beckham's leasehold interest "shall
be implemented in accordance with the terms and provisions of the applicable operating
agreement which governs operations on the [May 2004] Lease"; and (2) if a proposed
action affecting Beckham's leasehold interest is not contemplated by the operating
agreement, Mantle will discuss the proposed action with Beckham and obtain its consent
before acting.

 By its clear terms, the February 2005 letter agreement obligates Mantle, in the event
Mantle takes an action affecting Beckham's leasehold interest, to act in one of two ways. 
First, if the action is contemplated by the operating agreement, Mantle is required to
implement it according to the terms and provisions of the operating agreement. Second,
if the action is not contemplated by the operating agreement, Mantle must first notify
Beckham and obtain its consent to the action before moving forward. Beckham appears
to contend that the agreement also imposes on Mantle a general obligation to do nothing
"inimical" to Beckham's interests. We disagree. Looking only to the plain and ordinary
meaning of the terms of the letter agreement, we conclude that it imposes no such general
duty. See Dynegy Midstream Servs., L.P., 294 S.W.3d at 168; see also City of the Colony
v. N. Tex. Mun. Water Dist., 272 S.W.3d 699, 722 (Tex. App.-Fort Worth 2008, pet. filed)
(holding that, unless the operative clauses of a contract are ambiguous, "'[a]s a general
rule, recitals . . . will not control the operative clauses,'" and further, "'where the recitals are
broader than the contract stipulations, the former will not extend the latter'" (quoting
Gardner v. Smith, 168 S.W.2d 278, 280 (Tex. Civ. App.-Beaumont 1942, no writ)). 

 The question on appeal is, therefore, whether the October 2005 lease was an action
contemplated by the applicable operating agreement (the JOA) and, accordingly, whether
Mantle was obliged to notify Beckham and obtain its consent before entering into the new
lease. The JOA contains a provision entitled "Acquisition, Maintenance or Transfer of
Interest," which outlines the procedure by which a party acquiring a renewal or replacement
oil and gas lease affecting "lands within the Contract Area" must notify non-acquiring
parties of the acquisition and allow them the opportunity to participate for their
proportionate share. Our review of the JOA and its applicable exhibits reveals that the
"Contract Area" includes the lands covered by both the May 2004 lease and the AMI
provision of the exploration agreement. Because the October 2005 lease was negotiated
and effectuated under the AMI provision of the exploration agreement, we conclude that
Mantle's acquisition of the October 2005 lease was contemplated by the JOA and Mantle
was, therefore, not obligated to notify Beckham and obtain its consent before proceeding
with the October 2005 lease. 

 Thus, Mantle's only obligation was to act in accordance with the terms of the JOA. 
And as discussed above, Mantle so complied. Mantle sent Beckham multiple letters
regarding its acquisition of the October 2005 lease; the letters notified Beckham of the
acquisition and offered it the opportunity to participate by paying its proportionate share of
the costs to drill the consideration deep well. It is undisputed that Beckham never elected
to participate nor made payment of its proportionate share. Therefore, Mantle's actions
in acquiring the October 2005 lease were in accordance with the terms of the JOA.

 Based on the foregoing, we conclude that Mantle conclusively negated that it
breached its obligations under the February 2005 letter agreement. See Grinnell, 951
S.W.2d at 425. As such, the trial court did not err in granting summary judgment in favor
of Mantle on Beckham's claim that Mantle breached the letter agreement. Beckham's
second issue is overruled to the extent it challenges this ground for Mantle's summary
judgment. 

b. Fiduciary Duty

 With regard to Beckham's fiduciary duty claims, we must first address whether the
trial court erred in granting Mantle's motion and denying Beckham's cross-motion for
summary judgment on whether a fiduciary duty existed as a matter of law. See Tex. Mun.
Power Agency, 253 S.W.3d at 192; Dorsett, 164 S.W.3d at 661. Beckham contends that
Mantle acted as Beckham's agent in dealing with the Lessors. Agency is one type of
formal relationship that imposes certain fiduciary duties on the parties. Nat'l Plan Adm'rs,
Inc. v. Nat'l Health Ins. Co., 235 S.W.3d 695, 700 (Tex. 2007) (citing Johnson v. Brewer
& Pritchard, P.C., 73 S.W.3d 193, 200 (Tex. 2002)). Whether a plaintiff and defendant
have a formal fiduciary relationship, such as one based on agency, is a question of law. 
Id.; First Nat'l Acceptance Co. v. Bishop, 187 S.W.3d 710, 714 (Tex. App.-Corpus Christi
2006, no pet.). 

 An agent is defined as one authorized by another to transact business or manage
some affair for the other. Hartford Cas. Ins. Co. v. Walker County Agency, Inc., 808
S.W.2d 681, 687 (Tex. App.-Corpus Christi 1991, no writ). "An agent . . . consents to the
control of another, the principal, where the principal manifests consent that the agent shall
act for the principal." Bishop, 187 S.W.3d at 714. An agency relationship is not presumed;
the party asserting the relationship bears the burden of proving it. Id. "The party claiming
agency must prove the principal has both the right to assign the agent's task and the right
to control the means and details by which the agent will accomplish the task. . . . The right
of control is the 'supreme test' in establishing an agency relationship." Id. (citing State
Farm Mut. Auto. Ins. Co. v. Traver, 980 S.W.2d 625, 628 (Tex. 1998) (internal citation
omitted)).

 Even where a fiduciary duty does exist, we must nonetheless take into consideration
all aspects of the relationship "when determining the nature of the fiduciary duty flowing
between the parties." Nat'l Plan Adm'rs, Inc., 235 S.W.3d at 700. Unless otherwise
agreed, an agent's duty is to act solely for the benefit of the principal in all matters
connected with the agency. Id. (citing Restatement (Second) of Agency § 387 (1958)). 
However, the duties owed by the agent to the principal may be altered by agreement. Id.;
see Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 385 (Tex. 2000). Thus, "when
determining the scope of an agent's fiduciary duty to [its] principal," we factor in both the
nature and purpose of the relationship and the agreements between the parties. Nat'l Plan
Adm'rs, Inc., 235 S.W.3d at 700.

 Beckham argues that an agency relationship between it and Mantle was created by
(1) the May 2004 lease, (2) the May 2004 lease assignment from Mantle to Beckham, (3)
the February 2005 letter agreement, and (4) the actions of Mantle. We disagree. First,
although the May 2004 lease states that Mantle shall act "as the agent and attorney-in-fact"
for Beckham, that statement is then immediately limited by the following: "It is agreed that
the purpose of naming and appointing the Lessee [Mantle] . . . as the agent and attorney-in-fact is to allow the Lessor [the Scanio-Sheltons] to look to only one party for execution
and delivery of any release provided for in the foregoing provision of this Lease." Thus,
no agency relationship was created for purposes of the types of actions disputed in this
case--i.e., the negotiation of a new lease for the deep well rights without Beckham's
participation and consent. See Nat'l Plan Adm'rs, Inc., 235 S.W.3d at 700 (requiring the
reviewing court to determine the scope of the agency relationship by looking to agreements
between the parties). 

 With regard to the February 2005 letter agreement, Beckham appears to argue that
its terms imposed on Mantle broad and general obligations to do "no harm" to Beckham
and that this language somehow created an agency relationship. However, as previously
discussed, the recital in the letter agreement "assur[ing]" Beckham that Mantle would take
no action "inimical" to Beckham's interest does not supercede the specific operative terms
of the letter agreement, which required only two things of Mantle--either that it act in
accordance with the JOA or, if an action was not contemplated by the JOA, that it obtain
Beckham's consent before moving forward. See City of the Colony, 272 S.W.3d at 722. 
Furthermore, the "no harm" language emphasized by Beckham does not evidence any
intent on Mantle's part to transact business on behalf of Beckham or otherwise show that
Beckham had the "right to assign [Mantle's] task and the right to control the means and
details by which [Mantle] will accomplish the task." See Hartford Cas. Ins. Co., 808 S.W.2d
at 687; Bishop, 187 S.W.3d at 714. 

 Beckham also argues that the May 2004 lease assignment created an agency
relationship between Beckham and Mantle. The assignment contains a provision stating
that, "in accordance with . . . [the] requirement imposed upon [Mantle] in connection with
[Mantle] obtaining the required consent of the Lessor[s]" to the assignment, there was
"excepted and reserved" in Mantle a right to execute a release of Beckham's interest in the
May 2004 lease. Beckham points to one phrase in the reservation provision--that Mantle
has a right to "otherwise deal with the Lessor on behalf of [Beckham]"--and claims that it
is this language that creates the agency relationship. Emphasizing this language,
Beckham asserts that Mantle's assignment to Beckham of its interest in the May 2004
lease is the "foundation of Beckham's claim of fiduciary duty." However, looking to the
entirety of the provision, we conclude that the reservation provision in Mantle's assignment
to Beckham merely restates the requirements in the assignment provision of the May 2004
lease with the Lessors. See Frost Nat'l Bank, 165 S.W.3d at 312 (requiring us to review
the entire writing and attempt to harmonize and give effect to all the contract's provisions
so that none are rendered meaningless).

 Importantly, we note that the preceding documents all reference and/or were subject
to the provisions of the JOA, and the JOA expressly disclaims the creation of any fiduciary
relationship between Mantle and Beckham. (9) It states, in relevant part, that "[i]n their
relations with each other under this agreement, the parties shall not be considered
fiduciaries or to have established a confidential relationship but rather shall be free to act
on an arms-length basis in accordance with their own respective self-interest." Thus, even
if any agency relationship was created by the preceding documents, Mantle and
Beckham's agreement in the JOA to disclaim a fiduciary relationship is arguably an
alteration of that agency relationship. (10) See Nat'l Plan Adm'rs, Inc., 235 S.W.3d at 700. 

 Neither do we agree that Mantle's conduct created an agency relationship. 
Beckham contends that Mantle's representations that it was negotiating, and would obtain,
an extension of the May 2004 lease from the Lessors is evidence that it was acting on
Beckham's behalf. Beckham further claims that there is evidence that Mantle was "calling
the shots" in the letter sent by Mantle to the Lessors on October 4, 2005, which stated that
Mantle would choose to renew the May 2004 lease if Beckham elected to join. However,
we fail to see how either of these facts prove that Mantle was transacting business for
Beckham or that Beckham was exercising control over or directing the actions of Mantle,
which is the fundamental test for agency. See Hartford Cas. Ins. Co., 808 S.W.2d at 687;
Bishop, 187 S.W.3d at 714.

 We therefore conclude, as a matter of law, that no fiduciary relationship existed
between Mantle and Beckham. See Grinnell, 951 S.W.2d at 425. Even if the May 2004
lease and assignment and February 2005 letter agreement did create an agency between
the parties, that agency was created for the limited purpose of Mantle obtaining a release
from Beckham. See Nat'l Plan Adm'rs, Inc., 235 S.W.3d at 700. Moreover, nothing in the
conduct of Mantle or the agreements between the parties could be construed as evidence
that Beckham exercised control over the actions of Mantle, which is the fundamental test
of agency. See Bishop, 187 S.W.3d at 714. Thus, the trial court did not err in granting
Mantle's motion and denying Beckham's cross-motion for partial summary judgment
regarding the existence of a fiduciary relationship. See Dorsett, 164 S.W.3d at 661. 
Having concluded that no fiduciary duty exists as a matter of law, we need not reach
Beckham's contention that fact issues exist as to any breach of that duty. Beckham's
second issue is overruled to the extent it involves the trial court's summary judgment on
its breach of fiduciary duty claim.

 Having determined that the court did not err in granting the foregoing summary
judgments, which disposed of all claims between Beckham and Mantle except for
Beckham's claims for fraud and negligent misrepresentation, we will now analyze the
propriety of the trial court's instructed verdict on these remaining claims. 

B. Instructed Verdict

 By its third issue, Beckham argues that fact issues were raised at trial on its fraud
and negligent misrepresentation claims, and therefore, the trial court's instructed verdict
was erroneous. Beckham pled three theories of fraud--fraud by misrepresentation, fraud
by non-disclosure, and statutory fraud--and one claim of negligent misrepresentation.

1. Standard of Review

 "In reviewing the granting of an instructed verdict, we must determine whether there
is any evidence of probative force to raise a fact issue on the material questions
presented." Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994) (citation
omitted). An instructed verdict in favor of the defendant is proper if the plaintiff fails to
present evidence in support of an essential fact or where a defense to a plaintiff's cause
of action is conclusively proved. See Villegas v. Griffin Indus., 975 S.W.2d 745, 748-49
(Tex. App.-Corpus Christi 1998, pet. denied). In reviewing an instructed verdict, we view
the evidence in the light most favorable to the non-movant, disregard all conflicts in the
evidence, and afford the non-movant the benefit of all reasonable inferences arising from
the evidence. Szczepanik, 883 S.W.2d at 649. "If there is any conflicting evidence of
probative value on any theory of recovery, an instructed verdict is improper and the case
must be reversed and remanded for jury determination of that issue." Id. 

2. Fraud by Misrepresentation In its fraud by misrepresentation claim, Beckham alleged that Mantle
"misrepresented to Beckham and KLA in May through October 2005 that it was requesting
from and negotiating with the landowners an extension or renewal to the May [2004]
Lease" and "that it would acquire such an extension or renewal in exchange for the repair
of certain lease roads and that the lessors were agreeable." Mantle argues that the
alleged misrepresentation amounts to an alleged oral promise by Mantle to extend the May
2004 lease, a promise which would have been barred by the statute of frauds because
agreements to extend leases must be in writing and signed by the person to be charged. (11) 
See Tex. Bus. & Com. Code Ann. § 26.01 (Vernon 2009); Duke v. Sun Oil Co., 320 F.2d
853, 858 n.5 (5th Cir. 1963). Mantle contends that the damages sought by Beckham for
the alleged fraud are the benefits of this bargain that is unenforceable under the statute
of frauds; in other words, Mantle argues, Beckham's fraud claim is merely an attempt to
indirectly recover for the breach of an otherwise unenforceable promise and is therefore
barred. See Haase v. Glazner, 62 S.W.3d 795, 799 (Tex. 2001).

 An agreement to extend an oil and gas lease must be in writing in order be
enforceable. Duke, 320 F.2d at 858 n.5 (internal citation omitted) (reasoning that an oil
and gas lease is a transfer and conveyance of real property and must thus comply with the
statute of frauds to be enforceable). Here, we agree with Mantle that the oral promise to
obtain an extension of the May 2004 lease alleged by Beckham is just such an agreement,
and because it was not in writing, it is unenforceable under the statute of frauds. The
statute of frauds is meant to "prevent fraud and perjury in certain kinds of transactions by
requiring agreements to be set out in a writing signed by the parties." Haase, 62 S.W.3d
at 799. A party to an agreement may not frustrate the purpose of the statute and avoid its
requirements by employing a fraud claim to "essentially enforce a contract the [statute of
frauds] makes unenforceable." Id.; see also Quigley v. Bennett, 227 S.W.3d 51, 54-55
(Tex. 2007) (disallowing recovery of fraud damages where those damages consisted of an
overriding royalty interest that had been orally promised to plaintiff and was thus barred by
the statute of frauds). This means that the statute of frauds operates to bar a fraud claim
when that claim stems from an unenforceable contract and seeks benefit-of-the-bargain
damages. Baylor Univ. v. Sonnichsen, 221 S.W.3d 632, 636 (Tex. 2007); Case Corp. v.
Hi-Class Bus. Sys. of Am., Inc., 184 S.W.3d 760, 777 (Tex. App.-Dallas 2005, pet.
denied). The statute of frauds does not, however, bar recovery for fraud based on reliance
or out-of-pocket damages. Sonnichsen, 221 S.W.3d at 636; Haase, 62 S.W.3d at 799-800. Thus, "[t]he viability of [Beckham]'s fraud claim depends upon the nature of the
damages [it] seeks to recover." Sonnichsen, 221 S.W.3d at 636. Out-of-pocket, or
reliance, damages are restitutionary and measure the difference between the value of that
which was parted with and the value of that which was received. Id. Benefit-of-the-bargain
damages derive from an expectancy theory and measure the difference between the value
that was represented and the value actually received. Id.

 At trial, Beckham's damages evidence consisted of testimony and exhibits
attempting to prove up the value of the deep rights under the October 2005 lease. On
appeal, Beckham contends that it seeks more than benefit-of-the-bargain damages,
arguing that it "pled for and put on evidence of out-of-pocket damages, consequential
damages, disgorgement of profits, the imposition of a constructive trust, exemplary
damages, and other damages . . . ." However, the damages sought by Beckham are
essentially the benefits it expected when Mantle allegedly did not honor its alleged oral
promise to obtain an extension of the May 2004 lease. The consequential damages
claimed by Beckham were the loss of its deep rights under the May 2004 lease--which is,
in other words, a benefit Beckham expected if Mantle had honored its alleged promise to
extend the May 2004 lease. See Sonnichsen, 221 S.W.3d at 636 (holding that benefit-of-the-bargain damages are those "benefits [that] would have arisen only if" the alleged
contract had been honored). Moreover, disgorgement of profits is not a type of out-of-pocket damages. See Case Corp., 184 S.W.3d at 778-79 (citing Formosa Plastics Corp.
USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 49-50 (Tex. 1998)). 
Furthermore, our review of the trial record reveals no other evidence that Beckham "parted
with" anything of value in reliance on Mantle's alleged oral promise to extend the May 2004
lease. See Sonnichsen, 221 S.W.3d at 636. In fact, Beckham's own contention that it
refrained from taking any action because of Mantle's alleged misrepresentation militates
against a finding that it suffered any reliance or out-of-pocket damages. (12) 

 We conclude that Beckham's fraud by misrepresentation claim seeks only
benefit-of-the-bargain damages and is thus barred by the statute of frauds. See id.;
Haase, 62 S.W.3d at 799-800. Therefore, the trial court did not err in granting Mantle's
motion for instructed verdict on Beckham's fraud by misrepresentation claim. See Villegas,
975 S.W.2d at 748-49 (holding that an instructed verdict is proper when a defense to a
plaintiff's cause of action is conclusively proved). We overrule Beckham's third issue
insofar as it concerns this claim. 

3. Fraud by Non-Disclosure

 Beckham alleged that Mantle committed fraud by non-disclosure when it failed to
inform Beckham that it was negotiating and obtaining the October 2005 lease from the
Lessors. In its motion for instructed verdict and on appeal, Mantle argues that it owed no
fiduciary duty to Beckham and, thus, had no duty to disclose that it was negotiating a new
lease with the Lessors for the deep well rights on the property. We agree. 

 "'[A] failure to disclose information does not constitute fraud unless there is a duty
to disclose the information.'" Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V., 202
S.W.3d 250, 259 (Tex. App.-Corpus Christi 2006, pet. denied) (quoting Bradford v. Vento,
48 S.W.3d 749, 756 (Tex. 2001) (internal citation omitted)). "Generally, no duty of
disclosure arises without evidence of a confidential or fiduciary relationship." Ins. Co. of
N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998). (13) As previously discussed, the trial
court correctly granted Mantle's motion for summary judgment and denied Beckham's
partial motion for summary judgment on the existence of a fiduciary relationship between
the parties. Having affirmed the trial court's decision that no fiduciary duty existed between
Mantle and Beckham as a matter of law, we conclude that Mantle owed Beckham no duty
to disclose its negotiations of the October 2005 lease, and accordingly, the trial court did
not err in granting an instructed verdict on Beckham's claim for fraud by non-disclosure. 
See Villegas, 975 S.W.2d at 748-49. Beckham's third issue is overruled to the extent it
challenges the trial court's instructed verdict on fraud by non-disclosure.

4. Statutory Fraud

 Beckham's statutory fraud claim is based on Mantle's assignment to Beckham of
its interest in the May 2004 lease. Beckham alleged in its petition that because the
assignment is a "transaction involving real estate," Mantle committed statutory fraud when
it induced Beckham to accept the lease assignment by making "false promises" in the
February 2005 letter agreement to take no action "inimical to Beckham" and "to notify
Beckham . . . in the event [Mantle] took any action involving [Beckham's] interest" in the
May 2004 lease, promises which Mantle had no intention to fulfill. See Tex. Bus. & Com.
Code Ann. § 27.01(a)(2) (Vernon 2009).

 The business and commerce code provides that, in a transaction involving real
estate, fraud consists of a "false promise to do an act" that is material, not intended to be
fulfilled, made for the purpose of inducing the other party to enter a contract, and relied on
by the other party in entering the contract. Id. In our analysis of the motion for summary
judgment on Beckham's claim for breach of the February 2005 letter agreement, we
determined as a matter of law that the letter agreement created no general obligation--i.e.,
promise--for Mantle to take no actions inimical to Beckham's interest. Neither can we
conclude that the letter agreement contains a general promise that Mantle notify Beckham
if it takes any action involving Beckham's interest in the May 2004 lease. Rather, as we
have previously determined as a matter of law, the letter agreement obligated Mantle to
notify Beckham only in the event that Mantle takes an action affecting Beckham's interest
that is not contemplated by the JOA. Because the February 2005 letter agreement does
not even contain either of the promises alleged by Beckham, we cannot conclude that
those non-existent promises were false. As such, Beckham cannot prove an essential
element of its statutory fraud claim, and the trial court did not err in granting an instructed
verdict on the claim. See id.; Villegas, 975 S.W.2d at 748-49. Beckham's third issue is
overruled to the extent it challenges the trial court's instructed verdict on its statutory fraud
claim.


5. Negligent Misrepresentation

 The final claim tried to the jury was Beckham's claim for negligent
misrepresentation, in which it alleged that Mantle negligently "represented to Beckham .
. . on numerous occasions between May and October of 2005 that Mantle would secure,
or at least attempt to secure, a renewal of the May [2004] Lease as to the deeper depths
at a minimal cost." 

 To recover for negligent misrepresentation, Beckham was required to prove that
Mantle, in the course of a transaction in which it had a pecuniary interest and without
exercising reasonable care, supplied false information for the guidance of Beckham and
caused pecuniary loss to Beckham because of Beckham's justifiable reliance on the false
information. See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests, 991
S.W.2d 787, 791 (Tex. 1999) (citing Restatement (Second) of Torts § 552 (1977)). 
Importantly, the false information complained of in a negligent misrepresentation claim
"must be a misstatement of an existing fact rather than a promise of future conduct." 
Scherer v. Angell, 253 S.W.3d 777, 781 (Tex. App.-Amarillo 2007, no pet.) (citing Miller
v. Raytheon Aircraft Co., 229 S.W.3d 358, 379 (Tex. App.-Houston [1st Dist.] 2007, no
pet.)); see also C.E. Barker, Inc. v. FirstCapital Bank, No. 13-03-00421-CV, 2005 WL
1177910, at *4 (Tex. App.-Corpus Christi May 19, 2005, pet. denied) (mem. op.). Here,
the alleged false information--that Mantle "would secure, or at least attempt to secure,"
a renewal of the May 2004 lease--is a promise of future conduct. (14) At the time of its
communication, no extension or renewal of the May 2004 lease had been accomplished,
and any promise related to a possible yet, at that point, non-existent renewal was not
actionable as a negligent misrepresentation. See Scherer, 253 S.W.3d at 781; see also
C.E. Barker, Inc., 2005 WL 1177910, at *4. Absent any false information, Beckham was
unable to prove this essential element, and the trial court correctly granted Mantle's motion
for instructed verdict on Beckham's negligent misrepresentation claim. See McCamish,
Martin, Brown & Loeffler, 991 S.W.2d at 791; Villegas, 975 S.W.2d at 748-49. Beckham's
third issue is overruled insofar as it relates to this claim.

C. Attorney's Fees

 By its fourth and final issue, Beckham argues that the trial court erred in awarding
Mantle attorneys' fees because no evidence supported the award and the fees were not
segregated between causes of action for which and parties for whom fees are available
and those for which and for whom fees are unavailable. Under Texas law, a prevailing
party may recover attorney's fees only if provided for by statute or a contract between the
parties. Intercont'l Group P'ship v. KB Home Lone Star L.P., 295 S.W.3d 650, 653 (Tex.
2009); Tony Gullo Motors v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006). And it is true that
"if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a
claimant must segregate recoverable from unrecoverable fees." Chapa, 212 S.W.3d at
313; see also City of Austin v. Roberson, No. 13-06-00218-CV, 2008 WL 802315, at *4
(Tex. App.-Corpus Christi Mar. 27, 2008, no pet.) (mem. op.). However, it is also true that
parties are free to adopt a more liberal standard for recovery of attorney's fees, and when
they do so, we must give effect to and enforce the agreement as written. Intercont'l, 295
S.W.3d at 653; Wayne v. A.V.A. Vending, Inc., 52 S.W.3d 412, 417 (Tex. App.-Corpus
Christi 2001, pet. denied).

 Here, Beckham and Mantle's exploration and development agreement contained
a clause providing for attorney's fees, which reads as follows:

 If any Party should hereafter institute litigation against any other Party
alleging that such other Party has breached this Agreement or any contracts
or other instrument delivered pursuant hereto, the non-prevailing Party or
Parties (whether plaintiff or defendant) in such action shall reimburse the
prevailing Party for the prevailing Party's reasonable attorneys' fees, witness
costs, court costs, and all other reasonable costs in connection with such
litigation.


Although neither party raises it, we believe there is ambiguity within this provision of the
agreement. See Sage St. Assocs. v. Northdale Constr. Co., 863 S.W.2d 438, 445 (Tex.
1993) (holding that a court may determine ambiguity as a matter of law for the first time on
appeal); see also City of Alton v. Sharyland Water Supply Corp., 277 S.W.3d 132, 150
(Tex. App.-Corpus Christi 2009, pet. filed) (same). "Deciding whether a contract is
ambiguous is a question of law for the court." J.M. Davidson v. Webster, 128 S.W.3d 223,
(Tex. 2003) (citing Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983)). In construing a
written contract, our primary concern is to ascertain the true intentions of the parties as
expressed in the instrument. Id. A contract is not ambiguous if it can be given a definite
or certain legal meaning. Id.; City of Alton, 277 S.W.3d at 150. On the other hand, if the
contract is subject to two or more reasonable interpretations, the contract is ambiguous
and a fact issue exists on the parties' intent. Coker, 650 S.W.2d at 393-94. Discerning the
parties' intent is a determination left to the exclusive province of the fact finder. Id. at 394-95. 

 In this case, we cannot give the attorneys' fees provision in the exploration
agreement a definite or certain legal meaning because it is unclear whether the provision
covers all claims in litigation by one party against the other or merely claims for breach of
the exploration agreement and related contracts. The provision states that "if any Party
should . . . institute litigation against any other Party alleging" breach of the agreement or
related contracts, the prevailing party shall recover his attorneys' fees and other costs "in
connection with such litigation." (Emphasis added.) "Such litigation" could be construed
as referring to a lawsuit for "breaching this [exploration] Agreement or other instrument
delivered pursuant hereto," such that the prevailing party could only recover fees for a
breach of contract claim. Or, the same phrase could refer to a lawsuit instituted by one
party against another that contains a breach of contract allegation, in which case the
prevailing party may recover all of its fees, no matter whether the lawsuit includes claims
sounding in contract and in tort. It is the provision's use of the word "alleging" that creates
the uncertainty. Because it is subject to two reasonable interpretations, we conclude, as
a matter of law, that the provision is ambiguous. See id. at 393-94.

 Although we believe the attorney's fees provision in the exploration agreement is
ambiguous, we cannot determine whether the trial court so concluded because no findings
of fact or conclusions of law were filed in this case. When no findings of fact or
conclusions of law are filed, we presume the trial court made all necessary findings to
support the judgment. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); Cadle Co.
v. Ortiz, 227 S.W.3d 831, 834 (Tex. App.-Corpus Christi 2007, pet. denied). In its final
judgment, the trial court determined that Mantle was the prevailing party in the dispute with
Beckham and was "entitled to an award of attorney's fees and expenses" under the
provisions of the exploration agreement. The judgment states that the court "received
evidence concerning Mantle's entitlement" to fees and that Beckham's "contract claims are
intertwined with its other claims." The trial court then awarded Mantle $376,467.97 "in
necessary and reasonable attorney's fees . . . ." Based on our review of the record, this
dollar figure represents an amount equal to or very close to the fees requested by Mantle's
attorneys for their services on all of Beckham's claims--i.e., this amount did not reflect
segregation of those fees for services solely attributable to Beckham's tort claims. See
Chapa, 212 S.W.3d at 313 (requiring segregation for fees relating solely to claims for which
fees are not recoverable).

 In the absence of findings of fact or conclusions of law, we must presume the trial
court both correctly concluded that the attorneys' fees provision in the exploration
agreement was ambiguous and correctly construed it as providing for all fees incurred by
Mantle in defending against the entirety of Beckham's lawsuit. See Worford, 801 S.W.2d
at 109; Cadle Co., 227 S.W.3d at 834; Coker, 650 S.W.2d at 394-95 (holding that the
determination of the parties' true intent is a matter for the trier of fact); see also Inglish v.
Machen, No. 01-98-01267-CV, 2001 WL 832356, at *3 (Tex. App.-Houston [1st Dist.] July
19, 2001, no pet.) (mem. op.). This construction of the attorney's fee provision did not limit
Mantle's recovery to only those fees incurred in defending against the breach of contract
claims, and Mantle was, thus, not required to segregate its fees by recoverable and
unrecoverable claims. See Intercont'l, 295 S.W.3d at 653; Wayne, 52 S.W.3d at 417
(holding that parties are free to contract for a liberal fee-recovery standard). The trial court
did not err in awarding Mantle all of its fees under the exploration agreement. See
Intercont'l, 295 S.W.3d at 653 (providing for the recovery of attorney's fees pursuant to a
contract between the parties). Beckham's fourth issue is overruled. (15)

III. Conclusion

 The judgment of the trial court is affirmed.


 

 NELDA V. RODRIGUEZ

 Justice


Delivered and filed the 25th 

day of February, 2010.


1. In their briefing, both parties refer to appellants collectively as "Beckham" and appellees collectively
as "Mantle." For ease of reference, we will do the same in this opinion, unless the context requires otherwise.
2. In its brief, Beckham presents two issues: first, that there are, generally, fact issues remaining on
its claims against Mantle; and second, that there is no evidence supporting the trial court's award of attorneys'
fees to Mantle. For purposes of our analysis, we have reorganized Beckham's two general issues as four
more specific issues. See Tex. R. App. P. 47.1.
3. The five wells Mantle agreed to drill as consideration for the February 2004 assignment from
Beckham were drilled under the May 2004 lease. This lease also contained a "continuous drilling" clause,
which required the lessees (Mantle and Beckham) to commence drilling a new well within 120 days after
completion of any prior well.
4. In Mantle's assignment, the reference to the reservation read as follows:


 There is excepted and reserved in Assignor [Mantle] the right to execute a release of
Assignees' [Beckham and KLA] interest in all or any portion of the Lease on behalf of
Assignees . . . without the joinder of either Assignee, in accordance with such a requirement
imposed upon Assignor in connection with Assignor's obtaining the required consent of the
Lessor to this Assignment, and otherwise to deal with the Lessor on behalf of Assignees . .
. . Each of Assignees accepts the conveyance made herein subject to such reservation.
5. The relevant portion of the October 2005 lease read as follows:


 The consideration for the grant of this lease is the agreement of Lessee [Mantle] to undertake
the drilling of a well in search of oil and/or gas at a legal location on the leased premises and
which well (the "Consideration Well") shall be drilled to a depth in excess of 9,000 feet below
the surface of the earth. Operations for the drilling of such well shall commence on or before
sixty (60) days from the Effective Date, unless otherwise extended by Lessor. By drilling a
well to a depth below 9,000 feet (but not necessarily completing the same), Lessee shall be
deemed to have paid the entire consideration due for the purchase of this Lease.


Mantle negotiated and obtained a ninety-day extension of the primary term of the lease to allow for a delay
in the commencement of drilling operations.
6. This motion also asked for summary judgment on Mantle's counterclaim for tortious interference with
an existing contract. However, the counterclaim was later abandoned by Mantle.
7. The trial was based on Beckham's sixth amended petition, which included claims for fraud by
misrepresentation, fraud by non-disclosure, statutory fraud, and negligent misrepresentation.
8. In addition to traditional grounds, Beckham argued in its May 17, 2007 motion that it was entitled to
summary judgment because there was "no evidence" that Mantle complied with the provisions of the
exploration agreement. See Tex. R. Civ. P. 166a(i). However, a "no evidence" summary judgment is not
available to plaintiffs arguing that their own claims are conclusively established by the evidence. See id.
(stating that a party may be entitled to summary judgment on the ground that there is "no evidence of one or
more essential elements of a claim or defense on which the adverse party would have the burden of proof at
trial" (emphasis added)). Beckham's first issue is thus overruled to the extent it advances Beckham's "no
evidence" ground for summary judgment.


 In its motion for summary judgment, Beckham also argued that Mantle had breached the JOA as a
matter of law by depriving Beckham of its right to go non-consent on the deep well. Beckham has not
advanced this argument on appeal, however, so we do not address it. See Tex. R. App. P. 38.1(i).
9. Mantle also claims the absence of an agency relationship is evidenced by the exploration
agreement's provision that "[t]he Parties expressly do not intend to create, and no provision hereof shall be
construed as creating a partnership, joint venture, mining partnership, corporation, association or other
relationship whereby any Party shall ever be held liable for the acts either by omission or commission, of the
other . . . ." We are unpersuaded that this provision negates the existence of agency; it is clearly intended to
disclaim liability as to claims by third-parties, and we will therefore not consider it as evidence either for or
against agency. See Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex. 2005) (requiring the
reviewing court to consider the entire writing and attempt to harmonize and give effect to all the contract's
provisions so that none are rendered meaningless).
10. Beckham argues that the reservation in the May 2004 lease assignment--reserving in Mantle a right
to "otherwise deal with the Lessors on [Beckham]'s behalf"--was not subject to the JOA and, thus, not
included in the parties' disclaimer of fiduciary relationship. Even assuming this were the case, however, we
believe that this short phrase emphasized by Beckham is taken out of context of the remainder of the
reservation provision, which is clearly a reiteration of the requirement of the May 2004 lease that Mantle have
the right to execute a release on Beckham's behalf. See id. We are, therefore, unpersuaded by Beckham's
argument.
11. Beckham disagrees with this characterization of its fraud by misrepresentation claim. Beckham
contends in its brief that "the fraud and damages do not arise from a promise to convey real property; rather,
they arise from Mantle's misrepresentation to Appellants that it was requesting and negotiating for an
extension of a lease on Appellant's behalf, when, in fact, it was not." We do not agree with this depiction of
Beckham's claim. The misrepresentation actually pled by Beckham in its petition--that Mantle represented
to Beckham that "it would acquire such an extension or renewal in exchange for the repair of certain lease
roads and that the lessors were agreeable"--belies the characterization of the misrepresentation Beckham
now advances on appeal. (Emphasis added.)
12. Beckham argues that, regardless of the nature of its other claimed damages, the statute of frauds
does not bar the creation of a constructive trust relating to real property. See Procom Energy, L.L.A. v. Roach,
16 S.W.3d 377, 381 (Tex. App.-Tyler 2000, pet. denied). However, Beckham cites only half the rule of law
from its relied-upon authority--the complete rule related to the survival of constructive trusts is that "the
Statute of Frauds is not a bar to the creation of a constructive trust arising from an abuse of a confidential or
fiduciary relationship in the context of a parol transaction." Id. (citing Gaines v. Hamman, 358 S.W.2d 557,
560 (Tex. 1962); Smith v. Bolin, 271 S.W.2d 93, 96-97 (Tex. 1954); Fitz-Gerald v. Hull, 237 S.W.2d 256, 261
(Tex. 1951); Grace v. Zimmerman, 853 S.W.2d 92, 97 (Tex. App.-Houston [14th Dist.] 1993, no writ)). Having
already determined that no fiduciary relationship existed between Beckham and Mantle, we are unpersuaded
by Beckham's argument.
13. We note that a duty to disclose information can be imposed by other circumstances. In addition to
situations in which there is a fiduciary or confidential relationship, "a duty to speak may arise in an arms-length
transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to
disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information
when the new information makes the earlier representation misleading or untrue; and (3) when one makes
a partial disclosure and conveys a false impression, he has the duty to speak." Playboy Enters., Inc. v.
Editorial Caballero, S.A. de C.V., 202 S.W.3d 250, 260 (Tex. App.-Corpus Christi 2006, pet. denied). 
However, Beckham has not raised these arguments, in either the proceedings on Mantle's motion for
instructed verdict or now on appeal, so we do not address them in this opinion. See Tex. R. App. P. 33.1(a).
14. In its brief, Beckham argues that its negligent misrepresentation claim was not based on: 


 . . . a promise to do something in the future. Rather, it was a deliberate falsehood as to what
Mantle was doing in real time, to wit: "we are working on obtaining a lease extension," the
extension "won't be a problem," and "the lease extension will be obtained [for the cost of
constructing a new road on the property]."


Again, we do not agree with Beckham's characterization of its claim on appeal. As pled by Beckham in its
sixth amended petition, the live pleading for Beckham at the time of trial, the complained-of false information
was Mantle's alleged representation that it "would secure, or at least attempt to secure," a renewal of the May
2004 lease. (Emphasis added.) This language clearly complains of a promise to do a future act, and we do
not countenance Beckham's attempt to recast the claim now on appeal. See Scherer v. Angell, 253 S.W.3d
777, 781 (Tex. App.-Amarillo 2007, no pet.) (basing its determination of the relevant alleged false promise
on the claim as pled in the plaintiff's petition that was live at the time of trial).
15. Beckham also argues that the trial court erred by awarding fees to Mantle pursuant to its declaratory
judgment action. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2008). However, having affirmed
the trial court's award based on the contract between the parties, we need not reach this contention. See Tex.
R. App. P. 47.1.